FILED
United States Court of Appeals
Tenth Circuit

May 17, 2010

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

JEFFREY W. LEWIS, D.C.,

      Plaintiff-Appellee,

v.

RONALD TRIPP, D.C.,

      Defendant-Appellant,

and

OKLAHOMA STATE BOARD OF
CHIROPRACTIC EXAMINERS;
RUSSELL GILSTRAP, D.C.; HUGH
MCCLURE, D.C.; SHAYNE
JAVERSAK, D.C.; BILL MEAD,
D.C.; CORDER, D.C.; DR. JAMES
TOY; KENT CARTER, D.C.; VIKI
RASLER, D.C.; JEANIE GARDNER;
BETH CARTER; JOSEPH ENGLISH,

      Defendants.

No. 09-6105

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 08-CV-382-HE)**

---

Grant E. Moak, Assistant Attorney General (M. Daniel Weitman and Tricia L.
Everest, Assistant Attorneys General, on the briefs), Oklahoma Attorney
General's Office, Oklahoma City, OK, for Defendant-Appellant Ronald Tripp.

Daniel J. Gamino, Daniel J. Gamino & Associates, P.C., Oklahoma City, OK, for
Plaintiff-Appellee Jeffrey W. Lewis, D.C.

Before **BRISCOE,** Chief Judge, **BALDOCK,** and **GORSUCH,** Circuit Judges.

**GORSUCH**, Circuit Judge.

After Oklahoma state authorities revoked Jeffrey Lewis's license to practice chiropractic medicine, they suspected him of continuing his practice unlawfully. In short order, they swore out an administrative subpoena and searched his office to confirm their suspicions. Believing that the search was carried out in violation of his Fourth Amendment rights, Dr. Lewis sued. He named as a defendant, among others, Ronald Tripp, the president of the Oklahoma Board of Chiropractic Examiners. At summary judgment, the district court denied Dr. Tripp's claim of qualified immunity, but it did not set forth with specificity the facts supporting its conclusion that Dr. Tripp violated Dr. Lewis's Fourth Amendment rights. In these circumstances, our precedent instructs us to "review the entire record . . . and determine de novo whether the plaintiff in fact presented sufficient evidence to forestall summary judgment on the issue of qualified immunity." *Armijo v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1259 (10th Cir. 1998). Doing just that, we see no evidence in this record to suggest that Dr. Tripp was personally involved in the Fourth Amendment violation Dr. Lewis alleges. Accordingly, we hold that Dr. Tripp is entitled to qualified immunity.

I

Dr. Lewis started practicing chiropractic medicine in Norman, Oklahoma in 1997, and for almost ten years ran his own business, West Norman Chiropractic. In March 2006, however, the Oklahoma State Board of Chiropractic Examiners revoked Dr. Lewis's medical license, apparently due to untrue statements Dr. Lewis made in his license application. The Board stayed the revocation for one month to allow Dr. Lewis time to find a replacement to take over his practice. During this period, Dr. Lewis hired Ben Sanders, who began treating Dr. Lewis's patients on May 1, 2006.

Two weeks later, the Board's executive director, Beth Carter, received an anonymous tip that Dr. Lewis was still practicing medicine, though now without a license. To work out what the Board's response should be, Ms. Carter consulted the Board's legal counsel and the Board's president, Dr. Tripp. Later that same day, Ms. Carter swore out an administrative subpoena requiring Dr. Lewis to turn over "[a]ll medical records, claims, documents and/or forms which indicate name[s] of patient(s) from . . . March 28, 2006 to present." Aple. App. at 71.

Ms. Carter, accompanied by her assistant, Joseph English, and two sheriff's deputies, then went to West Norman Chiropractic to serve the subpoena on Dr. Lewis. When they arrived, Dr. Lewis was out of the office, so Ms. Carter gave the subpoena to an employee. A receptionist then handed over patient treatment cards she had at the front desk. According to Dr. Lewis, though hotly disputed by Dr.

Tripp, someone also took records from inside Dr. Lewis's personal desk. Ms. Carter next told various employees, as well as several patients sitting in the waiting room, that the clinic had to close. The clinic remained closed for one week, later reopening under Dr. Sanders's supervision, though the seized patient records weren't returned until approximately two months later. Meanwhile, Dr. Lewis's repeated requests for reinstatement of his license have failed.

Upset with the search of his office, Dr. Lewis responded with this lawsuit, contending that the search violated the Fourth Amendment of the United States Constitution. Dr. Lewis named as defendants the Board, the individual Board members, Ms. Carter, and Mr. English. After motions practice, however, all that remains for resolution at this point are Dr. Lewis's claims against Dr. Tripp. At summary judgment before the district court, Dr. Tripp argued that he was entitled to qualified immunity. The district court rejected that defense, and Dr. Tripp now seeks to appeal that ruling to us.[1]

---

[1] Before reaching the question of qualified immunity, Dr. Tripp initially argues that Dr. Lewis doesn't have Article III standing to pursue this case at all, because only West Norman Chiropractic and its patients — and not Dr. Lewis — were injured by the alleged search and seizure. *See* U.S. Const. art. III, § 2; *see also Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 180 (2000) (requiring an "injury in fact" for Article III standing). When we determine our jurisdiction at the summary judgment stage, however, we generally accept as true all well-pleaded facts supported by the record and draw all reasonable inferences in favor of standing. *See United States v. Colo. Supreme Court*, 87 F.3d 1161, 1164 (10th Cir. 1996). Even putting to the side that Dr. Lewis is the sole shareholder of West Norman Chiropractic and may have sustained injuries that overlap with those the business admittedly suffered, *cf. Guides, Ltd. v.*

(continued...)

II

Dr. Tripp argues that the district court erred in denying him qualified immunity because there are no facts in the record from which a reasonable jury could find that he participated in any of the allegedly unlawful conduct that Dr. Lewis complains of.  For his part, Dr. Lewis disputes all this, arguing to us that the facts are sufficient to suggest Dr. Tripp was personally involved.  Before we can address the parties' factual dispute, however, we must first confront a preliminary question concerning our authority to do so.

A

"[T]o shield them from undue interference with their duties [to the public] and from potentially disabling threats of liability," public servants, including Dr. Tripp, are entitled to qualified immunity.  *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982).  Qualified immunity is "an immunity from suit rather than a mere defense to liability."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis omitted).  It represents "the norm" for public officials, *Harlow*, 457 U.S. at 807, and serves to insulate from suit "all but the plainly incompetent or those who knowingly violate

---

[1](...continued)
*Yarmouth Group Prop. Mgmt., Inc.*, 295 F.3d 1065, 1072 (10th Cir. 2002), Dr. Lewis has offered some (albeit contested) evidence suggesting that records from inside his personal desk were searched and seized.  *See* Aple. App. at 47-48. Because it is "well established" in this circuit that "an employee has a reasonable expectation of privacy in his office," *United States v. Anderson*, 154 F.3d 1225, 1230 (10th Cir. 1998), Dr. Lewis has suffered a sufficient injury to invoke our jurisdiction under our precedents.

the law," *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  A plaintiff may overcome a public official's qualified immunity only by showing, first, that the official violated the plaintiff's federal statutory or constitutional rights, and, second, that the rights in question were clearly established at the time of their alleged violation. *Pearson v. Callahan*, 129 S. Ct. 808, 815-16 (2009).

Despite all this, in *Johnson v. Jones* the Supreme Court indicated that, at the summary judgment stage at least, it is generally the district court's exclusive job to determine which *facts* a jury could reasonably find from the evidence presented to it by the litigants.  515 U.S. 304, 313 (1995).  After doing so, the district court and we may then consider the "abstract" *legal* questions whether those facts suffice to show a violation of law and whether that law was clearly established at the time of the alleged violation. *Id.* at 317.  Ordinarily speaking, it is only these latter two questions — and not questions about what facts a jury might reasonably find — that we may consider in appeals from the denial of qualified immunity at summary judgment.  Of course, "determining whether there is a genuine issue of material fact at summary judgment is [itself] a question of law," *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1947 (2009), one we routinely review *de novo* in appeals from the grant of summary judgment.  Still, *Johnson* held that this practice doesn't normally pertain to appeals from the denial of qualified immunity.  *See* 515 U.S. at 313.  So, for example, if a district court concludes that a reasonable jury could find certain specified facts in favor of the plaintiff, the Supreme Court has

indicated we usually must take them as true — and do so even if our own *de novo* review of the record might suggest otherwise as a matter of law.

*Johnson*'s rule might appear, at first glance, to foreclose at least a good portion of Dr. Tripp's appeal. After all, his primary complaint seems to be that the district court erred when it found sufficient facts in the record from which a jury could infer his involvement in the allegedly illegal search. But that isn't the end of the matter, because *Johnson*'s rule has attracted exceptions that we must also consider. Without attempting an exhaustive list of those exceptions, the Supreme Court has drawn our attention to at least three.

First, the Court has indicated that, when the district court at summary judgment fails to identify the particular charged conduct that it deemed adequately supported by the record, we may look behind the order denying summary judgment and review the entire record *de novo* to determine for ourselves as a matter of law which factual inferences a reasonable jury could and could not make. *See Behrens v. Pelletier*, 516 U.S. 312, 313 (1996); *see also Johnson*, 515 U.S. at 319 (If a district court does not state the facts a reasonable jury could find at summary judgment, "a court of appeals may have to undertake a cumbersome review of the record to determine [those] facts."). Second, when the "version of events" the district court holds a reasonable jury could credit "is blatantly contradicted by the record," we may assess the case based on our own *de novo* view of which facts a reasonable jury could accept as true. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Third, we need not defer to the district court's assessment of the reasonable factual inferences that arise from a complaint at the motion to dismiss stage, but may instead assess for ourselves the sufficiency of the complaint as a matter of law *de novo*. *Iqbal*, 129 S. Ct. at 1947.[2]

B

This case falls within the first of these exceptions. The initial obligation of the district court in assessing a qualified immunity defense at summary judgment is to set forth with specificity the *facts* — the who, what, when, where, and why — that a reasonable jury could infer from the evidence presented by the parties. *See Armijo*, 159 F.3d at 1259 (the district court must "set forth with specificity the facts . . . that support a finding that the defendant violated a clearly established right"); *see also Behrens*, 516 U.S. at 313; *Johnson*, 515 U.S. at 319. Only then can the district court (and we, on appeal) undertake the job of answering the

---

[2] Whether, and to what extent, these exceptions are reconcilable with *Johnson*'s stated rationale that only "abstract" legal questions are immediately appealable orders; or the fact that when we assess the sufficiency of a record at summary judgment we do so, as *Iqbal* noted, only as a *matter of law*, just as we do at the motion to dismiss stage; or the fact that in other areas we decline to opine on the legal consequences of factual scenarios that we would hold implausible as a matter of law because doing so risks offering advisory opinions, are all questions that have engaged commentators. *See, e.g.*, Mark R. Brown, *The Fall and Rise of Qualified Immunity: From* Hope *to* Harris, 9 Nev. L.J. 185, 217-24 (2008); Thomas Healy, *The Rise of Unnecessary Constitutional Rulings*, 83 N.C. L. Rev. 847 (2005). Happily, however, this appeal doesn't require us to handle any of these thorny questions, and we take *Johnson*'s rule and its exceptions as currently posited by the Supreme Court as controlling our analysis in this case.

question whether the defendant is entitled to qualified immunity on those facts as a matter of law. Put differently, unless the district court undertakes the essential task of specifying what a reasonable jury could find the facts to be, there is no way it (or, later, we) can rationally determine whether those facts constitute a violation of clearly established law.

In this case, the district court failed to set forth the facts it believed a reasonable jury could find with respect to the critical question before us — the nature of Dr. Tripp's involvement, if any, in an unlawful search and seizure. Instead, the court merely stated that Dr. Tripp phoned the Board's office on May 16 and sent two emails to the Board's legal counsel. The court then immediately and summarily concluded that

> [t]his and other [unspecified] evidence proffered by the plaintiff creates a jury question as to whether Dr. Tripp personally directed, or had actual knowledge of and acquiesced in, the asserted [but unspecified] constitutional violation. *See Poolaw v. Marcantel*, __ F.3d. __, __, 2009 WL 1176466, at \*7 (10th Cir. 2009) ("For liability under section 1983, direct participation is not necessary. Any official who 'causes' a citizen to be deprived of her constitutional rights can also be held liable. The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights.") (internal quotation omitted).

D. Ct. Op. at 7-8.

The problem with this discussion is that it doesn't tell us what Dr. Tripp did or where, when, or why he took any action that might have violated Dr. Lewis's

- 9 -

Fourth Amendment rights. In other words, it does not "set forth with specificity the facts . . . that support a finding that the defendant violated a clearly established right." *Armijo*, 159 F.3d at 1259. Instead, the opinion merely advances the *legal* conclusion that Dr. Tripp did so, paraphrasing the legal standard for "supervisory liability" under 42 U.S.C. § 1983 we set forth in *Poolaw* and then holding the standard satisfied. Such a "conclusory legal ruling" does not constitute findings of fact to which we can defer. *Armijo*, 159 F.3d at 1262.[3]

According to the district court, a reasonable jury could conclude that Dr. Tripp "personally directed, or had actual knowledge of and acquiesced in," *some* constitutional violation. D. Ct. Op. at 7-8. But the court offered no indication

---

[3] In *Ashcroft v. Iqbal*, the Supreme Court recently held that "purpose rather than knowledge is required to impose *Bivens* liability on . . . an official charged with violations arising from his or her superintendent responsibilities." 129 S. Ct. 1937, 1949 (2009); *see also id.* ("each Government official . . . is only liable for his or her own misconduct"). This announcement has generated significant debate about the continuing vitality and scope of supervisory liability not only in *Bivens* actions, but also in § 1983 suits like the one before us. At one end of the spectrum, the *Iqbal* dissenters seemed to believe that the majority opinion "eliminates . . . supervisory liability entirely," overruling cases like *Poolaw*. *Id.* at 1957 (Souter, J., dissenting). At the other end of the spectrum, the Ninth Circuit has read *Iqbal* as possibly holding that "purpose . . . is required" merely in cases of alleged racial discrimination by governmental officials, given that *Iqbal* itself involved allegations of racial discrimination and such discrimination only violates the Constitution when it is intentional. *See al-Kidd v. Ashcroft*, 580 F.3d 949, 976 n.25 (9th Cir. 2009). Many intermediate positions are also surely plausible. *See, e.g.,* Sheldon Nahmod, *Constitutional Torts, Over-Deterrence and Supervisory Liability after* Iqbal, 14 Lewis & Clark L. Rev. 279, 294-98 (2010) (discussing some alternatives). We need not stake out a position in this debate today because, as will become clear, Dr. Lewis's claims fail even under our preexisting *Poolaw* standard.

what that constitutional violation was, and thus what Dr. Tripp allegedly did. Could a reasonable jury find that Dr. Tripp didn't offer his staff sufficient training in administrative subpoena work? That he told Ms. Carter to swear-out an administrative subpoena? Or to rifle through Dr. Lewis's papers? Or to close Dr. Lewis's practice? Some or all of these things? Or something else still? We don't know because the district court never told us. It goes without saying that different facts demand different legal analyses and call for different outcomes. And we cannot discharge our duty to say whether or not Dr. Tripp violated Dr. Lewis's clearly established constitutional rights without first knowing, as a factual matter, what a reasonable jury could find he did.

That said, we scarcely have the district court to blame for the paucity of facts. The reason the district court couldn't tell us anything about the "asserted constitutional violation" is that the plaintiff, Dr. Lewis, never described it in his complaint. Instead, Dr. Lewis just presented his own conclusory legal allegation that "[all of the] Defendants' unlawful conduct . . . violates Plaintiff's rights to be free from warrantless seizures as guaranteed" by the Fourth Amendment. Complt., Aplt. App. at 21. Dr. Lewis thus left the precise contours of that "unlawful conduct" to the court's imagination. Perhaps recognizing this infirmity, he did offer one version of the facts in his opposition to summary judgment in the district court, suggesting that the Board (including Dr. Tripp) facilitated Ms. Carter's conduct by "fail[ing] to fulfill [state] statutory requirements to promulgate

- 11 -

administrative rules governing internal procedures, . . . 'direct' the Executive Director, . . . provide training, and . . . timely hire an investigator." Objection to Motion for Summary Judgment, Aplt. App. at 133-34. But that doesn't clear up the confusion because in his appellate briefing Dr. Lewis has now suggested a *different* version of the facts — that Dr. Tripp "directed [Ms. Carter] by telephone and email . . . to prepare a subpoena . . . and to not only seize clinic and financial records, but to close the business and run off the staff." Answer Br. at 22. Given Dr. Lewis's own indecision about the wrongs he allegedly suffered at Dr. Tripp's behest, it's little wonder that the district court found that "[s]ome ambiguity exist[ed] as to the exact nature of the underlying constitutional violation" alleged by Dr. Lewis, D. Ct. Op. at 1 n.3, and did not make specific factual findings about Dr. Tripp's conduct.

## III

Given that we lack from the district court a set of facts about Dr. Tripp's conduct to guide our qualified immunity analysis, it falls on us to review the entire record, construing the evidence in the light most favorable to Dr. Lewis as the plaintiff, and to ask *de novo* whether sufficient evidence exists for a reasonable jury to conclude that Dr. Tripp trenched upon Dr. Lewis's clearly established rights. *Armijo*, 159 F.3d at 1259 (when the district court fails to specify the facts in play, the court of appeals must "review the entire record, construing the evidence in the light most favorable to the plaintiff" to "determine de novo

whether the plaintiff in fact presented sufficient evidence to forestall summary judgment on the issue of qualified immunity"); *see also Behrens*, 516 U.S. at 313; *Johnson*, 515 U.S. at 319. And it is here that we again pick up the parties' merits arguments about the content and significance of the record evidence.

Viewing the record before us in the light most favorable to Dr. Lewis, a reasonable jury could find the following facts about Dr. Tripp's alleged involvement in the search and seizure. Dr. Tripp was the Board president, and Ms. Carter, as the Board's executive director, worked for him. On the same day that Ms. Carter went to Dr. Lewis's office to serve the subpoena, Dr. Tripp copied Ms. Carter on two emails he sent to the Board's legal counsel. Aple. App. at 24-25. According to Ms. Carter's deposition, these emails concerned Dr. Lewis's unlicensed medical practice and indicated that Dr. Tripp had spoken with the city attorney's office and the police department. *Id.* at 25-26. One of the emails contained legal citations, though Ms. Carter may have received that email after the incident at Dr. Lewis's office. *Id.* at 33; Aplt. App. at 83.[4] According to Dr. Lewis, Dr. Tripp also called the Board office sometime that same day, though Ms. Carter didn't remember the phone call or its contents. Aple. App. at 27-28.

---

[4] The emails are not in the record, though Ms. Carter's deposition testimony describing them is. At no time has Dr. Tripp raised any objection to the consideration of that testimony. *Cf. Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1179 n.3 (10th Cir. 2007) (discussing waiver of challenge to admission of hearsay evidence at summary judgment).

These facts readily lend themselves to the inference that Dr. Tripp suspected Dr. Lewis of practicing medicine without a license. They also fairly suggest that Dr. Tripp wanted to report Dr. Lewis's activities to other state authorities who could obtain and execute a search of and perhaps close his practice. But there's nothing illegal, let alone clearly illegal, about any of this. Indeed, it would seem perfectly normal that the president of a state medical society would wish to report the unauthorized practice of medicine and see it investigated. As it happens, Oklahoma law expressly "authoriz[es] and empower[s]" the Board to adopt and seek to enforce professional standards and accreditation requirements. *See* Okla. Stat. tit. 59 § 161.6(B).[5] To avoid summary judgment, there has to be record

---

[5] Under the Oklahoma Chiropractic Practice Act,

The Board is authorized and empowered to: (1) Establish and maintain a procedure or system for the certification or accreditation of chiropractic physicians who are qualified in chiropractic post-doctorate Diplomate and all other chiropractic specialties; (2) Establish a registration system and adopt and enforce standards for the education and training of chiropractic physicians who engage in the business of issuing professional opinions on the condition, prognosis or treatment of a patient; (3) Adopt and enforce standards governing the professional conduct of chiropractic physicians, consistent with the provisions of the Oklahoma Chiropractic Practice Act, for the purpose of establishing and maintaining a high standard of honesty, dignity, integrity and proficiency in the profession; . . . (7) Employ legal counsel, as needed, to represent the Board in all legal matters and to assist authorized state officers in prosecuting or restraining violations of the Oklahoma Chiropractic Practice Act, and pay the fees for such services; (8) Order or subpoena the attendance of witnesses, the inspection of records and premises and the production of relevant books and papers for the investigation of

(continued...)

- 14 -

evidence from which a reasonable jury could infer something *more* than this. It's not enough that Dr. Tripp, acting pursuant to his statutory authority, set in motion a series of events that would naturally lead to the *lawful* execution of a search warrant or the *lawful* closure of Dr. Lewis's practice. Under *Poolaw*, a reasonable jury must be able to conclude that Dr. Tripp deliberately set into motion a series of events he knew or should've known would lead to *unlawful* action against Dr. Lewis.

Recognizing this obstacle, Dr. Lewis replies, as best we can tell, that his clearly established Fourth Amendment rights were violated in two ways. First, he suggests, the administrative subpoena itself was invalid, so Ms. Carter's collection of his records, including from his desk, was actually a warrantless seizure. As he reads Oklahoma law, the Board only has the authority to "subpoena . . . papers for the investigation of matters that may come before [it]," Okla. Stat. tit. 59 § 161.6(B)(8), and once Dr. Lewis had his license revoked, his unlicensed practice of medicine no longer qualified as a "matter[] . . . before" the Board. On this view, then, the Board had no jurisdiction to issue or execute the subpoena, and Ms. Carter seized Dr. Lewis's documents without any legal authority. *See Mancusi v.*

---

[5](...continued)
matters that may come before the Board; . . . (11) Establish minimum standards for continuing education programs administered by chiropractic associations . . . ; [and] (19) . . . promulgate a code of ethics.

Okla. Stat. tit. 59 § 161.6(B)(1)-(3), (7)-(8), (11), (19).

*DeForte*, 392 U.S. 364, 370-71 (1968); *United States v. Anderson*, 154 F.3d 1225, 1229-34 (10th Cir. 1998) (holding that warrantless search of private office usually violates Fourth Amendment).[6]

Second, even if Ms. Carter had the authority to issue the administrative subpoena, Dr. Lewis appears to suggest that she wrongfully treated it like a search warrant. Instead of serving the subpoena on Dr. Lewis and waiting for a response, she used it to seize records without a warrant, including records from Dr. Lewis's desk. While an administrative subpoena permits the government to compel the production of documents, Dr. Lewis argues, it doesn't allow the unfettered access that comes with a search warrant. *See, e.g.*, *See v. City of Seattle*, 387 U.S. 541, 544-45 (1967) ("while the demand to inspect may be issued by the [state] agency, in the form of an administrative subpoena, it may not be made and enforced by the inspector in the field" unless he or she also has a search warrant).

Even assuming without deciding that all this is so, an insuperable difficulty remains. The record before us lacks any evidence suggesting *Dr. Tripp's* involvement in any of these — allegedly — unlawful activities. We have no

---

[6] We harbor doubts about this view of Oklahoma law. After all, it asks us to accept that the Oklahoma Chiropractic Practice Act entrusts the Board "to apply to a court of competent jurisdiction for an order enjoining an unlicensed person from practicing chiropractic," Okla. Stat. tit. 59 § 161.14(B), and yet at the same time prohibits the Board from investigating whether someone is practicing chiropractic medicine without a license. But we need decide none of this because, as will be come apparent, Dr. Lewis's argument fails for another, more fundamental reason.

evidence, for example, that Dr. Tripp instructed Ms. Carter to obtain an administrative subpoena. Or that Dr. Tripp advised Ms. Carter to treat the subpoena as a search warrant and search Dr. Lewis's personal desk. In short, while the record before us permits the inference that Dr. Tripp was doing his *lawful* — and statutorily-charged — duty of alerting the authorities to a possible case of the unauthorized practice of medicine, the record lacks any facts suggesting Dr. Tripp "knew or reasonably should have known" that doing so would lead to an *unlawful* search or seizure, let alone one in violation of clearly established law. *Poolaw*, 565 F.3d at 732-33.

Instead, Dr. Lewis's case rests on the speculative assumption that one state officer seeking to report a violation of law to other state officers "just should've known" that those other officers would respond to the report by themselves violating the law. We have, however, previously and consistently rejected exactly this assumption, emphasizing that "more than pure speculation" is required "to defeat a motion for summary judgment." *Setliff v. Mem'l Hosp. of Sheridan County*, 850 F.2d 1384, 1393 (10th Cir. 1988). Most recently, in *Serna v. Colorado Department of Corrections*, 455 F.3d 1146 (10th Cir. 2006), we held that the Colorado director of prisons was entitled to qualified immunity because his mere authorization of a prison's special operations response team in circumstances calling for its use — without more — didn't implicate him in the team's subsequent use of excessive force against inmates. *See id.* at 1152-54. We did so

explaining that "no evidence suggests [the director] used [his authorizing] communications to instruct the officers to act unconstitutionally." *Id.* at 1153-54.

Exactly the same can be said here. There is no question that Dr. Tripp was legally authorized to report the unlicensed practice of medicine and solicit help from other state authorities to ensure its investigation and cessation. To survive summary judgment under *Poolaw*, Dr. Lewis had to come forward with some evidence that Dr. Tripp somehow knew or should've known that an *unlawful* investigation would follow from his decision to report Dr. Lewis's unauthorized practice of medicine. In the record before us, there is no evidence of this. Accordingly, Dr. Lewis hasn't demonstrated a constitutional violation, let alone a clearly established one. If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit. And Dr. Lewis has presented no evidence to suggest that Dr. Tripp was doing anything other than that.[7]

---

[7] In addition to pursuing a claim under the Fourth Amendment, Dr. Lewis also pursued a claim based on Article II § 30 of the Oklahoma Constitution. Throughout these proceedings, the parties and district court have proceeded on the premise that Dr. Lewis's state law claim is coextensive, and rises or falls, with his Fourth Amendment claim. *See* D. Ct. Op. at 1 n.2. On appeal, the parties don't mention that assumption, let alone challenge it or give us any reason to believe that it was erroneous. *Cf. Long v. State*, 706 P.2d 915, 916-17 (Okla. Crim. App. 1985) (declining the opportunity to interpret Article II § 30 in tension with the U.S. Supreme Court's interpretation of the Fourth Amendment because the former is "almost an exact copy" of the latter (quoting *DeGraff v. State*, 103 P. 538, 541 (Okla. Crim. App. 1909))). Accordingly, we hold Dr. Lewis's Oklahoma constitutional claim fails for the same reasons as his Fourth

(continued...)

* * *

The district court's order denying summary judgment is reversed, and this matter is remanded with instructions that the district court enter summary judgment in favor of Dr. Tripp.

---

[7](...continued)
Amendment claim does.

09-6105, <u>Lewis v. Tripp, et al.</u>

**BRISCOE,** Chief Judge, dissenting.

I respectfully dissent.  First, I disagree with the notion that because the district court "doesn't tell us what Dr. Tripp did or where, when, or why he took any action that might have violated Dr. Lewis's Fourth Amendment rights," <u>see</u> Maj. Op. at 9-10, "it falls on us . . . [to determine] whether sufficient evidence exists for a reasonable jury to conclude that Dr. Tripp trenched upon Dr. Lewis's clearly established rights," <u>see</u> <u>id.</u> at 12.  And second, even if we must engage in the fact-finding expedition which the majority suggests, I disagree with the facts the majority finds.

The district court found that Dr. Lewis had "create[d] a jury question as to whether Dr. Tripp *personally directed* . . . the asserted constitutional violation," explicitly noting its reliance on the evidence which demonstrated that "Ms. Carter . . . was copied on emails Dr. Tripp sent the Board's legal counsel regarding Lewis," and that "Dr. Tripp . . . phoned the Board office on May 16th."  D. Ct. Op. at 7 (emphasis added).  The majority contends that because the district court "doesn't tell us what Dr. Tripp did or where, when, or why he took any action that might have violated Dr. Lewis's Fourth Amendment Rights,"  Maj. Op. at 9-10, pursuant to <u>Johnson v. Jones</u>, 515 U.S. 304, 319 (1995), "it falls upon us to review the entire record . . . and to ask *de novo* whether sufficient evidence exists for a reasonable jury to conclude that Dr. Tripp trenched upon Dr. Lewis's clearly established rights," <u>id.</u> at 12.  I disagree.

Though the district court did not elaborate on what it meant by "personally directed," I do not think such an explanation was necessary. Rather, it is clear from the district court's language what it thought a reasonable jury could find based upon the allegations and evidence presented by Dr. Lewis: that Dr. Tripp called and/or emailed Ms. Carter and explained that he wanted her to serve a subpoena on Dr. Lewis and that he wanted her to shut down West Norman Chiropractic. Because the district court adequately set forth the facts it believed a reasonable jury could find, the limited nature of our jurisdiction to entertain an appeal from a denial of qualified immunity requires us to accept as true Dr. Lewis's assertion that Dr. Tripp directed all of Ms. Carter's relevant behavior on the day in question. And accepting these allegations as true, I would conclude that based upon the clearly established nature of Lewis's Fourth Amendment rights, and pursuant to our decision in Poolaw v. Marcantel, 565 F.3d 721, 733 (10th Cir. 2009) (noting that a supervisor may be held liable under § 1983 if he or she "set in motion a series of events they knew or reasonably should have known would result [in a constitutional violation]"), Dr. Tripp is not entitled to summary judgment on qualified immunity grounds.

Further, even if we must engage in the fact-finding suggested by the majority, I would reach the same conclusion. The majority contends that:

> The record before us lacks any evidence suggesting Dr. Tripp's involvement in any of these—allegedly—unlawful activities. We have no evidence, for example, that Dr. Tripp instructed Ms. Carter to obtain

2

an administrative subpoena.  Or that Dr. Tripp advised Ms. Carter to treat the subpoena as a search warrant and search Dr. Lewis's personal desk.

Maj. Op. at 16-17 (emphasis omitted).  I disagree with the absolutes used in describing the absence of evidence presented.  There was sufficient evidence presented here to enable Dr. Lewis to withstand a motion for summary judgment.

As the majority explains, "[t]o work out what the Board's response [to the allegations against Lewis] should be, Ms. Carter consulted . . . the Board's president, Dr. Tripp." Id. at 3.  If we view this consultation—which occurred in the form of two emails and one phone call—in the light most favorable to Dr. Lewis, it is reasonable to infer that Dr. Tripp told Ms. Carter both to obtain the subpoena and to execute it in the manner that she did.[1]  See Scott v. Harris, 550 U.S. 372, 378 (2007) ("[C]ourts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion.  In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." (citations and alteration omitted) (internal quotation marks omitted)).  And because this inference can be reasonably drawn, I would, once again in light of Dr. Lewis's clearly established rights and our

---

[1] I acknowledge that reasonableness of this inference might have been called into question had more details regarding the nature of the communications between Ms. Carter and Dr. Tripp been properly admitted into evidence.

3

decision in <u>Poolaw</u>, conclude that Dr. Tripp is not entitled to summary judgment on qualified immunity grounds.