FILED
United States Court of Appeals
Tenth Circuit

December 19, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

THE ESTATE OF B.I.C., a minor child, deceased; LARRY F. CROSETTO, individually and as next friend of C.S.C., a minor child; MARY LOU CROSETTO,

Plaintiffs - Appellants,

v.

LINDA GILLEN, individually and as an agent of the Kansas Social and Rehabilitation Services,

Defendant - Appellee.

No. 11-3219

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 6:10-CV-01017-MLB-KGG)

---

Randall K. Rathbun, (and Molly McMurray of Depew, Gillen, Rathbun & McInteer, LC, with him on the briefs), Wichita, Kansas, for Plaintiffs - Appellants.

Gerald L. Green, (and Maureen A. Redeker of Gilliland & Hayes, P.A, with him on the brief), Manhattan, Kansas, for Defendant - Appellee.

---

Before **KELLY**, **HOLLOWAY**, and **MATHESON**, Circuit Judges.

---

**KELLY**, Circuit Judge.

This case stems from the death of a minor child, 23-month-old Brooklyn Coons ("BIC"), on January 20, 2008, at the hands of her father's girlfriend. Plaintiffs-Appellants, Larry and Mary Crosetto and the Estate of BIC, filed an action alleging that a social worker, Defendant-Appellee, Linda Gillen, created the danger that resulted in the death of their granddaughter and denied them their rights to familial association. The district court granted summary judgment in favor of Ms. Gillen, and declined to hear a supplemental state law claim. II Aplt. App. 356. On appeal, Plaintiffs argue that qualified immunity was unwarranted on their state danger-creation and familial association claims. Our jurisdiction arises under 28 U.S.C. § 1291. We agree that qualified immunity was not appropriate on the state danger-creation claim given genuine issues of material fact. Thus we reverse in part. We affirm summary judgement on the familial association claims.

Background

In reviewing the grant of summary judgment, we view the facts presented in the light most favorable to the nonmoving party. See Dodds v. Richardson, 614 F.3d 1185, 1191–92 (10th Cir. 2010).

Angela Coons and her children (BIC and "CSC"), lived with her parents, Mr. and Mrs. Crosetto, after she left her husband, Randy Coons, in August 2006.

-2-

II Aplt. App. 212. In August 2007 Angela died suddenly, and Randy removed BIC and CSC from the Crosettos' home. Id. The children often stayed with their grandparents, however, on weekends. Id. Mr. Coons lived with his girlfriend, Melissa Wells, who has since been found guilty of BIC's murder and claims to have been suffering from a methamphetamine addiction at the time. Id.

Appellee, Linda Gillen, has been a social worker with the Kansas Department of Social and Rehabilitative Services ("SRS") in Coffeyville, Kansas for the past several decades. Id. at 290. Mr. and Mrs. Crosetto claim that Ms. Gillen had intense hatred for their family, stemming from events that occurred during their adoption of Angela in 1982. Id. at 173–74, 211–12. The Crosettos also claim that Ms. Gillen knew about Melissa Wells and her background because she had been in the custody of SRS as a child. Id. at 174–75.

Soon after Randy Coons took back his children, the Crosettos started to notice bruising on BIC when she would visit. Id. at 332. The babysitter also noticed that BIC had "a black eye, a busted lip with stitches and random bruising all over her body." Id. at 217. She alleges that she called SRS's child protection hotline. Id. at 217–18. On September 17, 2007, a school district employee also reported concerns about BIC and CSC to SRS. Id. at 220–21. A few weeks later, Mr. Crosetto took BIC to the emergency room, but he admittedly did not contact SRS at that time because he was attempting to create a conservatorship for BIC and CSC. Id. at 333. He did call the fire department and ask for an inspection of

Randy Coons's home, and though the fire chief examined the exterior, he never heard back after requesting permission to inspect the inside. Id. at 212.

On November 5, 2007, CSC came to school with a 2-inch by 2-inch red mark on the right side of his face that required ice. Id. at 333. The school reported the incident to SRS, and Ms. Gillen interviewed Ms. Wells who admitted to getting upset with the child and slapping him across the face. Id. Ms. Gillen met with Mr. Coons and Ms. Wells to discuss the incident, but did not report it to law enforcement. Id. At this time Ms. Wells already had been reported to SRS on August 27, 2006 for bruises and a head injury on her biological child. Id. at 175. Reports had also been made that the Coons/Wells home was filthy, that Melissa Wells smoked pot, and that her car smelled like marijuana. Id. On November 6, 2007—the day after the slapping incident—Mr. Crosetto claims to have attempted to contact Ms. Gillen. Id. at 213. He allegedly tried again on November 14, 15, and 16, but could not reach Ms. Gillen until November 20. Id. At that time, Mr. Crosetto claims that Ms. Gillen said that she had been to the home to investigate the situation, which the Crosettos dispute. Id. In this same phone conversation, Mr. Crosetto claims that Ms. Gillen said that allegations of child abuse were "police matters" and refused to discuss them. Id.

On December 10, 2007, Mr. Crosetto again called Ms. Gillen about the persistent bruising on BIC, and he claims that she responded that "her job was to preserve the family unit and not to investigate child abuse." Id. at 178. On

December 24, 2007, Mr. Crosetto took BIC to Dr. Chan Han, who sent a letter to SRS requesting that they investigate. Id. at 229. Ms. Gillen claims that she never received this letter. I Aplt. App. 45. Around this same time, Coffeyville Police Department School Resource Officer, Ed Rutherford, observed BIC and left a message for Ms. Gillen. II Aplt. App. 232. He never received a response. Id. Officer Rutherford then filed a Child in Need of Care Case Report and sent it to SRS, the Juvenile County Attorney's Office and the school's truancy officer. Id.

On December 28, 2007, the Crosettos met with Ms. Gillen and attempted to give her a CD of pictures showing BIC's injuries, but she refused to accept it saying that it was a police matter. Id. at 214. The Crosettos allege that Ms. Gillen's animus towards them was evident at this meeting, and they told her that if she did nothing one of the children would end up dead. Id.

On January 17, 2008, the Coffeyville police responded to a 911 call, finding BIC with bruises and head trauma while in Ms. Wells's care. I Aplt. App. 12. She was hospitalized and transferred to Tulsa, Oklahoma, where doctors found "a brain bleed from a blow to the head and brain damage resulting from Shaken Baby Syndrome." Id. BIC died on January 20, 2008 at the age of twenty-three months. Id.

After BIC's death, Camie Russell, Director for the Abuse, Neglect, and Exploitation Unit of the Kansas Attorney General's Office reviewed twelve of Ms. Gillen's cases, including BIC and CSC's case. II Aplt. App. 206–09. She

-5-

determined that Ms. Gillen treated BIC and CSC's case differently than the other eleven cases assigned to her. Id. at 207. She concluded that Ms. Gillen failed to fulfill multiple responsibilities to BIC and CSC. Id. at 208. Among these failures, Ms. Russell noted that Ms. Gillen failed to interview or observe other children living in the home, failed to report to law enforcement that Ms. Wells admitted hitting CSC, failed to interview other caretakers, and failed to complete follow up on reports from law enforcement. Id. Ms. Russell also determined that Ms. Gillen handled the Coons children differently, taking a more "hands off" approach than she did in her other cases. Id. at 207.

The Crosettos claim that Ms. Gillen created the danger that resulted in the death of BIC and denied the Crosettos and CSC their rights to familial association. Ms. Gillen filed a motion to dismiss based on qualified immunity, but the district court denied this motion and limited discovery to the question of qualified immunity. Ms. Gillen then filed an amended motion for summary judgment based on qualified immunity which the district court granted. The court held that Ms. Gillen was entitled to qualified immunity because her overall conduct was not decidedly affirmative and did not shock the conscience. II Aplt. App. 349. It declined to exercise supplemental jurisdiction over the state law claim. II Aplt. App. 354.

<u>Discussion</u>

We review de novo the district court's grant of summary judgment based on qualified immunity. <u>Christiansen v. City of Tulsa</u>, 332 F.3d 1270, 1278 (10th Cir. 2003). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying or reviewing the application of Rule 56(a), we view all evidence in the light most favorable to the nonmoving party. <u>Dodds</u>, 614 F.3d at 1191–92.

A. <u>Qualified Immunity</u>

Qualified immunity protects government employees from suit, except those who are "plainly incompetent or those who knowingly violate the law." <u>Lewis v. Tripp</u>, 604 F.3d 1221, 1225 (10th Cir. 2010) (quotation omitted). A plaintiff may only overcome a government official's immunity by showing "first, that the official violated the plaintiff's federal statutory or constitutional rights, and, second, that the rights in question were clearly established at the time of their alleged violation." <u>Id.</u>

　　　1.　　　<u>Violation of a Constitutional Right</u>

The Due Process clause of the Fourteenth Amendment protects an individual's life, liberty, and property against government actions. <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986). Generally, it does not require the state to protect life, liberty, and property of its citizens against invasion by private actors.

DeShaney v. Winnebago Cnty. Dep't Soc. Servs., 489 U.S. 189, 195 (1989).

There are, however, two recognized exceptions to this rule. First, state officials may be liable for the acts of private parties when the state has assumed a special relationship with and control over an individual. Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008). Second, state officials can be liable for the acts of private parties where those officials created the very danger that caused the harm. Christiansen, 332 F.3d at 1281 (citation omitted). The Crosettos argue that the danger-creation exception applies here.

As an initial matter, a showing of affirmative conduct and private violence are preconditions necessary to invoking the state-created danger theory. Gray v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 920 n.8 (10th Cir. 2012). Here there is no question whether BIC's death was caused by an act of violence by a private party. There is, however, a question as to whether there is sufficiently "affirmative conduct on the part of the state in placing the plaintiff in danger." Id. at 916 (quotation and emphasis omitted). Our precedents consistently conclude that mere negligence or inaction is not enough. In particular, a social worker who fails to act may be negligent but does not forfeit immunity when there is no affirmative action. See, e.g., Robbins v. Oklahoma, 519 F.3d 1242, 1251–52 (10th Cir. 2008) (social worker not liable for failure to revoke a daycare's license where no there was no affirmative act creating an impression that the daycare would be safe); Ruiz v. McDonnell, 299 F.3d 1173, 1183 (10th

-8-

Cir. 2002) (social worker not liable for failing to conduct a background check of a childcare facility where no alleged affirmative conduct).

The district court held, as a matter of law, that Ms. Gillen's conduct—while "hard to explain or justify"—was not actionable because it was not "decidedly affirmative" conduct. II Aplt. App. 349. Instead, the court concluded, Ms. Gillen "basically did nothing in the face of evidence that would cause any thinking person, not merely someone supposedly trained, to recognize that B.I.C. and C.S.C. were in peril." Id. We disagree.

There remains an issue here as to whether Ms. Gillen purposefully, maliciously, and intentionally failed to act—therefore placing BIC and CSC in harm's way. This is more than negligence or indifference; the evidence viewed in the light most favorable to the plaintiffs indicates a deliberate decision to ignore based on decade-old animosity toward the Crosetto family. We have yet to hold that such intentional or malicious inaction cannot constitute an act for purposes of establishing a danger-creation claim. In Currier v. Doran, we concluded that a state social worker's alleged failure to investigate allegations that a father abused his child sufficiently stated a due process claim where the social worker was aware of the father's history of financial irresponsibility, the child's bruises, and numerous allegations of abuse. 242 F.3d 905, 920 (10th Cir. 2001). Although here there was no state removal or placement of BIC as occurred in Currier, there were numerous, specific indications of abuse and a deliberate decision not to

-9-

remove the children or respond in any way to the extensive evidence of abuse. A rational trier of fact could find that Ms. Gillen's conduct went well beyond merely allowing unreasonable risks to persist, but was deliberate, affirmative conduct in light of her specific knowledge of real danger to BIC.

Even if inaction based on expressed animus would not alone satisfy the requirement of an affirmative act, the Crosettos suggest several affirmative acts by Ms. Gillen. They point to at least five specific "acts" that a finder of fact could determine sufficiently affirmative: (1) Ms. Gillen's refusal to return police phone calls; (2) Ms. Gillen's refusal to accept a CD of photos showing injuries to the Coons children; (3) Ms. Gillen's alleged lying about being in the Coons's home; (4) Ms. Gillen's telling the Crosettos the abuse of the Coons children was not her issue, but one for law enforcement; and (5) Ms. Gillen's claims that allegations of abuse by Ms. Wells were unsubstantiated. We need not decide that all of these acts are affirmative. Rather, we accept the district court's characterization, in denying the initial motion to dismiss, that "defendant's instruction to call the police and refusal to accept evidence of abuse were affirmative acts." I Aplt. App. 24.

A refusal is more than a mere failure to act. As the district court initially found, "On December 10, 2007, Mr. Crosetto called defendant to report that the bruises on their grandchildren[] were escalating. Defendant told Mr. Crosetto to contact the police. Plaintiffs further allege that they provided defendant with a

-10-

CD of photographs of B.I.C.'s injuries and that defendant <u>refused</u> to accept it."

<u>Id.</u> The way in which Ms. Gillen discouraged the Crosettos and others from reporting abuse directly to her and her refusal to receive documentation of the abuse are sufficiently affirmative forms of conduct to proceed with a danger-creation claim.

Other district courts have come to similar conclusions given a similar failure to investigate claims of or prevent abuse at the hands of another. <u>See, e.g.</u>, <u>Kuyper v. Bd. of Cnty. Comm'rs of Weld Cnty.</u>, No. 09-cv-00342-PAB-MEH, 2010 WL 1287534, *8 (D. Colo. Mar. 30, 2010) (finding social worker's failure to inform and misrepresentation to foster parents of a foster child's history of sexual misconduct sufficiently affirmative to state a danger-creation claim); <u>Briggs v. Oklahoma ex rel. Okla. Dep't of Human Servs.</u>, 472 F. Supp. 2d 1304, 1314 (W.D. Okla. 2007) (finding case worker's discouraging reports of abuse similarly sufficient). In cases such as <u>Gray</u> and <u>DeShaney</u> "[t]he most that c[ould] be said of the state functionaries . . . is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." <u>DeShaney</u>, 489 U.S. at 203; <u>see Gray</u>, 672 F.3d at 925 (hospital's misrepresentation that a patient would receive 24-hour care was not a sufficiently affirmative act to invoke the danger-creation doctrine). This is not the most that can be said of Ms. Gillen. The Crosettos have shown at least two affirmative acts sufficient to proceed with their danger-creation claims.

In order to succeed on a danger-creation claim a plaintiff must meet all elements of a six-part test:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

Christiansen, 332 F.3d at 1281 (quotation omitted). Here, however, the district court only concluded that the Crosettos failed to prove the sixth element, and held that Ms. Gillen's behavior did not shock the conscience without addressing the other factors. See II Aplt. App. 339–41, 349.

We disagree here as well. The record reveals additional facts that corroborate the Crosettos' position that Ms. Gillen's conduct was outrageous and conscience-shocking. These facts, taken in the light most favorable to the Crosettos, could constitute violations of due process rights at trial. In particular, after BIC's death, Camie Russell, the director of the state's Abuse, Neglect and Exploitation unit in the Attorney General's office, reviewed several cases handled by Ms. Gillen. She signed an affidavit stating that Ms. Gillen's "handling of abuse cases other than the Coons was very hands on. She undertook actions without court order based upon suggestions made by the county attorney or the district judge. As to the Coons children she was very hands off." Id. at 207. Furthermore, Ms. Russell stated:

-12-

Based upon my investigation, there were only two explanations for her different handling of the abuse of the Coons children. One possible explanation was that her failure to act on the Coons children was a product of someone blocking her from taking action. The other explanation was that she had some animus or ill will toward the Crosettos and elected to do nothing to protect the children. I have concluded the latter was the case for two reasons: (1) Gillen denied that anyone had blocked her from taking any action toward the Coon[s] children and (2) in Gillen's meeting with law enforcement and the Crosettos on the day after Brook was taken to the hospital, Gillen's animosity toward Larry Crosetto was so obvious that Detective George indicated that she wishes that she would have recorded the interaction.

Id. at 207–08. Ms. Russell also listed what Ms. Gillen failed to do in her handling of the Coons case. Id. at 208.

In the end, there remain fact questions surrounding the Crosettos' substantive due process claims, including the motivation of Ms. Gillen and therefore the potential outrageousness of her conduct. In deciding that there remain material questions of fact, we are mindful of the policy concerns underlying the requirements for a danger-creation claim including "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety." Currier, 242 F.3d at 920. Yet, in viewing the cumulative impression of Ms. Gillen's conduct, see id., we cannot agree with the district court that there was no conscious-shocking action as a matter of law. No reasoned justifications or policy considerations support such a conclusion. An intentional or spiteful failure to act to protect a child in one's care could be an action sufficient to shock even

-13-

the conscience of a federal judge.  See II Aplt. App. 340–41 ("To shock the conscience of federal judges requires a high level of outrageousness.").

In reversing the grant of summary judgment on the grounds of qualified immunity, we recognize that there are five other elements of a danger-creation claim BIC will have to meet in order to be successful.  Because the district court did not rely on any of these factors in its decision, we leave it to the district court to analyze them in the first instance upon remand.

2.      Clearly Established Law

Ms. Gillen briefly argues that, if the court must reach the second part of the qualified immunity inquiry—whether the law was clearly established—a reasonable person in her position would not have been aware that she was subject to constitutional liability based on court precedent.  Aplee. Br. 50–51.  She states that "a refusal to act . . . has never been held as a basis for liability under a danger creation theory or familial association claim."  Id. at 51.

It seems to us, however, that Ms. Gillen should have known that if she did, in fact, intentionally fail to act based on animus toward the Crosetto/Coons family, she could have been liable under a danger-creation theory.  This is not a case where the facts, if true as alleged, would fall within a "hazy border" between acceptable and illegal behavior.  See Brosseau v. Haugen, 543 U.S. 194, 201 (2004).  Even under the theory that intentional, malicious inaction can give rise to danger-creation liability, a reasonable actor in Ms. Gillen's position would not

-14-

have believed that she would be entitled to qualified immunity if she deliberately and maliciously chose not to respond to numerous and specific indications of child abuse. See Hope v. Pelzer, 536 U.S. 730, 740–41 (2002) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances."). Spiteful and purposeful inaction when the well-being of a child is at stake certainly "shocks the conscience" and would put a reasonable person on notice that they are doing more than merely failing to act because they are overworked or busy. It was error for the court to grant summary judgment on this issue, given the evidence including statements and investigation by Ms. Gillen's superiors. We therefore reverse the court's grant of summary judgment on the issue of qualified immunity.

B. Familial Association

The Crosettos and CSC also claim that their due process rights to familial association were violated by Ms. Gillen's actions preceding BIC's death. They appeal the district court's decision dismissing these claims as well.

As an initial matter, claims for loss of familial relationship are not necessarily limited to those brought by parents or children. See Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty., 768 F.2d 1186, 1188–89 (10th Cir. 1985). In an unpublished opinion, this court has recognized that the right can extend to grandparents in certain circumstances. Suasnavas v. Stover, No. 05-5171, 196 F. App'x 647, 657 (10th Cir. Aug. 25, 2006) (citing Trujillo's recognition of the

-15-

importance of the familial relationship between grandparents and grandchildren). When extending the right to grandparents, however, courts often consider whether the grandparents are "custodial figure[s]" or "acting in loco parentis," and "whether there is a potential conflict between the rights of the [grandparent] and the rights or interests of the [child's] natural parents." Rees v. Office of Children & Youth, 744 F. Supp. 2d 434, 450, 455 (W.D. Pa. 2010), aff'd 473 F. App'x 139 (3d Cir. Mar. 30, 2012). We do not need to decide whether such considerations merit extending the right to the grandparents in this case because the claim fails even if there is a substantive due process familial interest.

In order to show deprivation of the right to familial association, a plaintiff must show that the state actor intended to deprive him or her of a specially protected familial relationship. Trujillo, 768 F.2d at 1190. In Bryson v. City of Edmond, 905 F.2d 1386 (10th Cir. 1990), we addressed a familial association claim brought against various government actors when a postal service employee killed several people inside of a post office. The claims alleged "failures of the postmaster and the guardsmen to train, supervise, examine or afford medical care to [the shooter] in deprivation of plaintiffs' associational right[]" to their deceased family members. Id. at 1393. We held that the family members failed to plead any specific intent to interfere with their relationships, and therefore the claims failed. Id. Furthermore:

To allege that "[b]y [specified] acts and conduct . . . defendant

-16-

intentionally, or with conscious disregard for plaintiff's rights" deprived them of associational rights, with the qualification immediately following that "[s]pecifically, Defendant knew, or should have known that by the actions set forth above, death was likely to occur, and the plaintiffs, and those they represent, would be denied the companionship and association of the decedent," does not meet the <u>Trujillo</u> requirement.

<u>Id.</u> at 1393–94 (alterations in original). Therefore, the claim failed because "[n]owhere in the complaint [was] there an allegation that any claimed acts or omissions, however intentional, occurred with the specific intent on the part of the defendants to deprive the plaintiffs of their rights of association with the victims." <u>Id.</u> at 1394.

The same is true here. The district court granted summary judgment on this claim concluding that there was no issue of fact as to whether Ms. Gillen had the specific intent to cause the death of BIC. <u>See</u> II Aplt. App. 352–53. The Crosettos even admit that they do not think that Ms. Gillen intended to bring about the death of BIC. Aplt. Br. 35. Therefore, their familial association claims fail. <u>See, e.g.</u>, <u>Coffey v. United States</u>, Nos. CIV 08–0588 MV/WDS, CIV 09–0028 JB/LFG, 2011 WL 2729068, at *10–*11 (D.N.M. July 7, 2011).

The Crosettos argue that they do not need to show that Ms. Gillen intended to cause BIC's death but only need to show an intent to interfere with the relationship in some way. Yet there similarly is no evidence or reasonable inference that Ms. Gillen's conduct was directed at the intimate relationship with an intent to adversely affect it. <u>See Trujillo</u>, 768 F.2d at 1190. Because there is

-17-

no evidence that her actions—even if based on animus—were based on an intent to interfere with the Crosettos' or CSC's relationship with BIC, these claims must fail and the district court correctly granted summary judgment on them.

C.  Two-Year Limitations Period

Finally, Ms. Gillen argues that a two-year limitations period bars BIC's, CSC's, and the Crosettos' claims.  The limitations period for claims arising under § 1983 is determined by the law of the state in which the cause of action arose. See Wilson v. Garcia, 471 U.S. 261, 269, 276 (1985), other parts superseded by statute.  The appropriate limitations period for a survivor's action is two years. KAN. STAT. ANN. § 60-513(a)(4).  Though Ms. Gillen agrees, see Aplee. Br. 48, she argues that the alleged "injury" based on her conduct took place in 2007, and therefore these claims are time-barred, id. at 49.

This argument is without merit.  The injury that took place, and for which the Crosettos are filing suit, is the death of BIC and the alleged loss of familial association caused by her death.  Aplt. Reply Br. 27.  This occurred on January 20, 2008.  Therefore, filing on January 19, 2010 was within the two-year limitations period.

AFFIRMED in part; REVERSED in part, and REMANDED for further proceedings.  We DENY Plaintiffs' amended motion to file a supplemental appendix as the material was not before the district court.  See Fed. R. App. P. 10(a).

11-3219, *The Estate of B.I.C., et al. v. Gillen*

**MATHESON**, J., concurring

I agree we should affirm the district court's decisions to dismiss the Plaintiffs' familial association claim and to deny Defendant Gillen's statute of limitations defense. I also agree we should reverse and remand on the danger-creation claim because Ms. Gillen's failure to help BIC based on her alleged longstanding hatred of the Crosettos and in the face of substantial child abuse evidence could shock the conscience.

We need not address whether Ms. Gillen's intentional inaction constitutes "affirmative conduct" as that term is used in danger-creation jurisprudence. I further do not think existing law clearly establishes that such intentional inaction constitutes "affirmative conduct."

In *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), the Supreme Court held that state actors who "played no part in the[] creation" of danger to a plaintiff, and who did nothing to "render him any more vulnerable" to danger, were not liable under the Due Process Clause for acts of private violence. *Id.* at 201. Given this limitation, a plaintiff may establish a substantive due process claim under a danger-creation theory by proving the following elements:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically

definable group; (3) defendant['s] conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003) (quotations omitted).

The parties vigorously contest the first element, but the district court chose to skip elements one through five and rest its summary judgment ruling on element six—whether Ms. Gillen's conduct shocks the conscience.

It is not clear whether the district court assumed, without deciding, that elements one through five could be proved, or thought it could simply bypass those elements as long as addressing element six would resolve the summary judgment motion. The court recognized that the Plaintiffs must show that "affirmative acts created or increased the danger to BIC," Dist. Ct. Op at 10; that "defendant's overall conduct must be decidedly affirmative," *id.* at 20; and that "little affirmative conduct appears," *id.* But it nonetheless explicitly relied on element six—failure to show that the defendant's conduct shocks the conscience—to grant summary judgment to Ms. Gillen.

Although affirmative conduct is "a necessary precondition" of a danger-creation claim, *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 925 (10th Cir. 2012), the shocks-the-conscience part of such a claim concerns the defendant's "conduct as a whole," *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995). This

-2-

includes both action and inaction. *See Currier v. Doran*, 242 F.3d 905, 920 (10th Cir. 2001) (stating that a social worker's failure to act could be conscience-shocking under a danger-creation theory). Viewed in the light most favorable to the Plaintiffs, Ms. Gillen's refusal to accept evidence from the Crosettos that BIC was being abused and her refusal to help BIC based on her alleged longstanding hatred of the Crosettos is sufficient for Plaintiffs to withstand summary judgment on the shocks-the-conscience element.

I agree with the majority that remanding this case will allow the parties and the district court to address whether summary judgment should be granted based on the other five elements of the danger-creation claim.

The majority addresses "whether Ms. Gillen purposefully, maliciously, and intentionally failed to act—therefore placing BIC and CSC in harm's way." Maj. Op. at 9. It concludes that our precedent clearly establishes that such inaction constitutes affirmative conduct that exposed Ms. Gillen to danger-creation liability. *See id.* at 14. Because this question goes to element one of the Plaintiffs' danger-creation claim, and because the district court based its ruling only on element six, I would not address this issue.

In addition, I am not convinced that clearly established law holds that such intentional inaction constitutes affirmative conduct that would defeat a qualified immunity defense. We have said that "[i]naction by the state in the face of a known danger is not enough to trigger the obligation" to protect a plaintiff under

a danger-creation theory, *Graham v. Indep. Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994), because inaction does not change the "status quo" and expose the plaintiff to acts of private violence, *see Currier*, 242 F.3d at 924.  It is thus not clearly established that inaction, even if intentional and malicious, constitutes "affirmative conduct" as that term is used in our danger-creation jurisprudence.