**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 16, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

| | |
|---|---|
| PATRICK E. CALLAHAN; SCOTT A. HAMMONS; JASON PITTMAN, <br><br> Plaintiffs - Appellees, <br><br> v. <br><br> UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS; RICK ARMSTRONG, Chief of Police, in his official and individual capacities; KEVIN STEELE, Assistant Chief of Police, in his official and individual capacities, c/o Kansas City, Kansas Police Department, MICHAEL YORK; VINCE DAVENPORT; JAMES BROWN; GREG LAWSON, CURTIS NICHOLSON, in their official and individual capacities, <br><br> Defendants - Appellants. | Nos. 14-3171, 14-3228 and 14-3230 |

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. Nos. 2:11-CV-02621-KHV;2:12-CV-02028-KHV;2:12-CV-02010-KHV)**

---

Ryan B. Denk, (Teresa A. Mata and Robert M. Smith of McAnany, Van Cleave & Phillips, P.A.; and Henry E. Couchman, Jr. of Unified Government of Wyandotte County, on the briefs), Kansas City, Kansas, for Defendants - Appellants.

Brian F. McCallister, of McCallister Law Firm, P.C. and Arthur A. Benson III (and Jamie Kathryn Lansford of Arthur Benson & Associates, with him on the

briefs), Kansas City, Missouri, for Plaintiffs - Appellees.

Before **KELLY**, **HARTZ**, and **GORSUCH**, Circuit Judges.

**KELLY**, Circuit Judge.

The individual Defendants-Appellants appeal from the district court's denial of their motions for summary judgment based upon qualified immunity. The entity Defendant-Appellant (Unified Government of Wyandotte County/Kansas City) also appeals, arguing that should we determine a constitutional violation did not occur, we should reverse and render judgment in its favor. As we discuss, we have jurisdiction to consider the denial of qualified immunity to the individual Defendants. We reverse the district court's denial of qualified immunity on the basis that the law was not clearly established at the time of the arrests in question. We dismiss the Unified Government's appeal for lack of jurisdiction.

<u>Background</u>

These consolidated cases arise from a sting operation designed to determine if police officers in the Kansas City, Kansas Police Department's (KCKPD) SCORE Unit were stealing from residences while executing search warrants. As a result of the sting operation, three officers were indicted and pled guilty to

federal crimes.[1]  The remaining officers brought claims under 42 U.S.C. § 1983,

asserting violations of their Fourth Amendment rights for arrests without probable

cause.[2]

A.    Events Leading to the Arrests

The SCORE Unit is a specialized, tactical component of the KCKPD,

equivalent to a SWAT team.  V Aplt. App. 715; X Aplt. App. 1295.  Throughout

the spring and summer of 2010, KCKPD received three allegations of theft from

residences where SCORE had participated in executing search warrants.  V Aplt.

App. 717; X Aplt. App. 1297.  Based on these allegations, the KCKPD planned a

sting operation in collaboration with the FBI to determine the integrity of the

SCORE Unit—"Operation Sticky Fingers."  V Aplt. App. 720–21; X Aplt. App.

1298.

Operation Sticky Fingers involved the execution of a fictitious search

---

[1]  Officers Darrell Forrest, Jeffrey Bell, and Dustin Sillings.

[2]  This appeal involves three cases consolidated for appeal.  Callahan v. Unified Gov't, No. 14-3171 (individual defendants: former Police Chief Rick Armstrong, Assistant Chief Lieutenant Colonel James Brown, former Captain Greg Lawson, and former Captain Curtis Nicholson); Hammons v. Unified Gov't, No. 14-3228 (individual defendants: Armstrong, Lawson, Nicholson, and former Major Vince Davenport); and Pittman v. Unified Gov't, No. 14-3230 (individual defendants: Armstrong, Lawson, Nicholson, former Assistant Chief Lieutenant Colonel Kevin Steel, and former Captain Michael York).  For simplicity's sake, we refer to all individual defendants collectively as "Defendants" and all plaintiffs collectively as "Plaintiffs."  Four related but separate actions are also on appeal.  Gambrill v. Unified Gov't, No.14-3229; Gardner v. Unified Gov't, No.14-3234; Hoang v. Unified Gov't, No. 14-3233; and Mills v. Unified Gov't, No. 14-3235.

warrant by the SCORE team at a residence monitored via live video and audio feed by Detective Jon Kelley of the KCKPD and FBI Special Agent Bob Schaefer. V Aplt. App. 729, 731; X Aplt. App. 1303, 1305. Bait items had been placed in the northwest bedroom and the basement. V Aplt. App. 729; X Aplt. App. 1303. While observing the live video, Detective Kelley was able to observe several instances of actual theft.[3] Because of the protective gear the SCORE officers were wearing, Detective Kelley could not identify which officers he observed committing theft. See V Aplt. App. 733; X Aplt. App. 1306. Therefore, he relayed his observations to Captain Lawson at another location, who would then contact Captain Nicholson, present at the residence. V Aplt. App. 732; X Aplt. App. 1305. Captain Nicholson, based on the secondhand information, would attempt to identify the officers Detective Kelley observed by going to the rooms where the thefts occurred. V Aplt. App. 732; X Aplt. App. 1305. Because the house was small and the information was delayed in getting to Captain Nicholson, it was possible for the officers to have moved around the house before Captain Nicholson could accurately identify them. X Aplt. App. 1305.

After the sting, the SCORE officers returned to the parking garage at KCKPD headquarters, where KCKPD commanders arrested all the members of

---

[3] Plaintiffs are inconsistent in the number of thefts they admit occurred. See Aplee. Br. at 1–2, 9, 11; Oral Arg., 26:22–26. We find the exact number of thefts immaterial.

the SCORE unit as they exited their van. V Aplt. App. 739; X Aplt. App. 1309; see Aplee. Br. at 3. It was later determined that only Officers Forrest, Bell, and Sillings were involved in the thefts. At the time, however, the extent of the thefts and the identities of the thieves remained unknown.

B.     The Lawsuits that Followed

In their civil rights suits, Plaintiffs Callahan, Pitman, and Hammons, who did not participate in the thefts, claim that no probable cause existed to arrest them.[4] Before the district court, Plaintiffs moved for partial summary judgment on this issue. Viewing the facts in favor of the Defendants, the district court denied Plaintiffs' motions, concluding that the record could support a finding that probable cause existed to arrest the entire SCORE unit. XVII Aplt. App. 2615–44. The individual Defendants then moved for summary judgment on the issue of qualified immunity. The district court, in Callahan, overruled this motion, merely citing genuine issues of material fact—without identifying those facts. Id. at 2608-09.

Defendants filed a motion for reconsideration of the Callahan order, requesting a more thorough explanation of the issues of fact on which the court relied. At the same time, Defendants also filed a notice of appeal. The court overruled Defendants' motion for reconsideration, reiterating that it based its

---

[4] Plaintiffs also brought claims under state law.

decision on genuine issues of material fact. Callahan v. Unified Gov't, No. 11-CV-2621-KHV, 2014 WL 4437559, at *3 (D. Kan. Sept. 9, 2014). The court then briefly explained the facts on which it based its ruling, characterizing them as either undisputed or construed in favor of the Plaintiff.

First, the court found that Defendants arrested Plaintiffs, as opposed to merely detaining them.[5] Second, nobody saw Plaintiffs commit or witness the thefts. Id. at *4. Also notable to the court was that Police Chief Armstrong told the commanders making the arrest that "a few" of the SCORE members had stolen during the sting. Id. Finally, "[w]hile defendants maintain that the SCORE unit was close knit (suggesting that SCORE officers knew that some were stealing), plaintiff [Callahan] maintains that they were not; rather, they trusted each other to know what they were doing and to do the right thing at work." Id. at *4 n.5. Applying the original Callahan ruling, the court denied summary judgment in Pittman and Hammons as well. XVII Aplt. App. 2715–18. Defendants then filed an amended notice of appeal of the Callahan order and also appealed both the Pittman and Hammons orders. We consolidated these appeals for procedural purposes.

---

[5] For purposes of this appeal, Defendants concede that an arrest occurred.

- 6 -

## Discussion

A.    Our Limited Jurisdiction

Qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  This protection applies to "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  We review de novo a district court's denial of a summary judgment motion raising qualified immunity. Gross v. Pirtle, 245 F.3d 1151, 1155 (10th Cir. 2001).  Because qualified immunity establishes "immunity from suit rather than a mere defense to liability," Lewis v. Tripp, 604 F.3d 1221, 1225 (10th Cir. 2010) (internal quotations and citation omitted), a district court's denial of a claim of qualified immunity is immediately appealable under 28 U.S.C. § 1291. Mitchell v. Forsyth, 472 U.S. 511, 530 (1985).  Our jurisdiction, however, is limited to whether the facts of the case constituted a violation of clearly established law. Clark v. Wilson, 625 F.3d 686, 689 (10th Cir. 2010).  We lack jurisdiction if the district court denied qualified immunity based only on evidence sufficiency. Gross, 245 F.3d at 1156.

Plaintiffs argue that we lack jurisdiction to hear this appeal because the district court's order relied on disputes of material facts and not questions of law.

But if the district court inadequately explains the factual basis for its decision, we have the authority to "review the entire record *de novo* to determine for ourselves as a matter of law which factual inferences a reasonable jury could and could not make." Lewis, 604 F.3d at 1225. Invoking this, Defendants argue that the district court did not sufficiently identify the facts supporting its conclusion. Therefore, they argue, we should perform an independent review of the record.

We find that unnecessary. The district court made clear that it based its decision on disputed facts and, despite its brief explanation,[6] sufficiently established for us what the operative facts were. Regardless, we have jurisdiction to hear the individual Defendants' appeals. In reaching our decision, we are not "second-guessing the district court's determinations of evidence sufficiency."

---

[6] The court explained why it "did not 'address all arguments, evidence and matters presented by parties. . .'": "Given the fact that for nearly four years, the Court has had one and sometimes two vacancies out of six authorized district judge positions, the Court encourages the parties to contact their United States Senators Pat Roberts and Jerry Moran to address this Court's inability to accommodate their request for more plenary work product." The court also noted that:

> It is an overstatement to say it is only fair that the more people use a resource, the more they should pay for it. This axiom makes sense regarding electricity; not so much regarding the federal court system. But judicial resources are finite. At some point, increasing caseloads [and decreasing judicial resources] detrimentally affect the level of service . . . that . . . federal judges provide.

Id. (alterations in original) (quoting David R. Cohen, Special Masters Versus Magistrate Judges: No Contest, Fed. Law., Sept. 2014, at 76).

Gross, 245 F.3d at 1157 (citing Behrens v. Pelletier, 516 U.S. 299, 312–13 (1996)).  Rather, "under any view of the facts," we cannot say that Defendants violated Plaintiffs' clearly established rights.  See Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1067–68 (10th Cir. 2010).

B.     Qualified Immunity

Summary judgment is proper only if no dispute of material fact exists and "the movant is entitled to judgment as a matter of law."  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (internal quotations omitted).  In deciding this, we view the evidence in favor of the nonmovant.  Id.  When a defendant raises the defense of qualified immunity, the plaintiff bears the burden to demonstrate that the defendant violated his constitutional rights and that the right was clearly established.  See Gross, 245 F.3d at 1155–56.  If the plaintiff meets this burden, then the defendant must show that no genuine issues of material fact exist.  Id. at 1156 (citing Albright v. Rodriguez, 51 F.3d 1531, 1535 (10th Cir. 1995)).  This high burden requires Plaintiffs here to not only establish that no probable cause existed, but also that this was clearly established law such that reasonable officers in this case would know that their actions were improper.  We have discretion to decide which prong of the qualified immunity analysis to address first.  Pearson, 555 U.S. at 236.  Because we conclude that Plaintiffs have not carried their burden in showing that the law was clearly established, it is unnecessary to address whether Defendants had probable cause.

In this circuit, to show that a right is clearly established, the plaintiff must point to "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Estate of Booker v. Gomez, 745 F.3d 405, 427 (10th Cir. 2014) (quoting Fogarty v. Gallegos, 523 F.3d 1147, 1161 (10th Cir. 2008)). The law is also clearly established if the conduct is so obviously improper that any reasonable officer would know it was illegal. See Hope v. Pelzer, 536 U.S. 730, 739–42 (2002). Without such conduct, case, or consensus, we may not second-guess judgments of law enforcement with the benefit of hindsight.

Plaintiffs and the district court confounded this inquiry by engaging in generic, overbroad, and conclusory analyses on the question of clearly established law. Both assert that the law was clearly established that an officer must have probable cause to make a warrantless arrest. Of course it was. But such a sweeping pronouncement of the law could not put Defendants on fair notice that their conduct was illegal. Presenting the issue so broadly is at odds with the Supreme Court's consistent admonishment "not to define clearly established law at a high level of generality." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2084 (2011). Though "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." Stanton v. Sims, 134 S. Ct. 3, 5 (2013) (quoting al-Kidd, 131 S. Ct. at 2083).

The proper and properly-focused inquiry is whether the law was clearly

- 10 -

established that an officer could not arrest an entire small group when he knows some unidentifiable members, if not all members, of that group have committed a crime. This question of probable cause in multi-suspect situations is far from beyond debate. Plaintiffs and the district court relied upon Ybarra v. Illinois to remind us that probable cause must be particularized to the individual who is searched or seized. Ybarra v. Illinois, 444 U.S. 85, 91 (1979). Indeed, Ybarra may have served as a case on point if Maryland v. Pringle—which the district court appears to have overlooked in its clearly established law analysis—had never been decided. But Pringle makes the question debatable at the very least, and therefore precludes a finding that the law was clearly established. See, e.g., Tracey Maclin, The Pringle Case's New Notion of Probable Cause: An Assault on Di Re and the Fourth Amendment, 2004 Cato Sup. Ct. Rev. 395, 427 (2004) (positing that Pringle likely "translates into a new per se rule that permits the arrest of multiple suspects whenever police discover contraband in compact spaces"); 2 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 3.6(c) (5th ed.) (recognizing an "undercurrent" in Pringle that views probable cause "as something less than more-probable-than-not and views arrest as sometimes serving an investigative function" and admitting that it is uncertain if this will impact "how lower courts construe the case in the years ahead"); 2 Wayne R. LaFave, et al., Crim. Proc. § 3.3(b) (3d ed.) (citing precedent that probable cause requires "a basis for singling out but one person,"

but admitting Pringle "can be interpreted otherwise").

In Ybarra, police officers in possession of a valid search warrant covering a tavern and its bartender also searched the patrons in the tavern. Ybarra, 444 U.S. at 88–89. The Court, holding the searches of the patrons unconstitutional, explained that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Id. at 91 (citing Sibron v. New York, 392 U.S. 40, 62–63 (1968)). Particularized probable cause "cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be." Id.

In Pringle, an officer pulled a car over for speeding. Maryland v. Pringle, 540 U.S. 366, 368 (2003). When the driver retrieved his registration, the officer observed a large amount of money in the glove compartment. Id. The driver consented to a search of his vehicle, which revealed the money as well as five small bags of cocaine located behind the backseat armrest. Id. When none of the three occupants of the car claimed the drugs, the officer arrested all three. Id. at 368–69. Pringle attempted to suppress his later confession as the fruit of an illegal arrest, arguing the officer lacked probable cause particularized to him. Id. at 369.

The Supreme Court rejected this argument and distinguished this case from Ybarra. Id. at 373. First, all three men had access to the drugs. Id. at 371–72.

- 12 -

This was a "relatively small automobile, not a public tavern," and car passengers are often engaged in a "common enterprise" and "have the same interest in concealing the fruits or the evidence of their wrongdoing." Id. at 373 (internal quotation marks and citation omitted). Drug dealing, the Court noted, is "an enterprise to which a dealer would be unlikely to admit an innocent person with the potential to furnish evidence against him." Id. It was reasonable for the officer to conclude he had probable cause that Pringle committed the drug crime "either solely or jointly." Id. at 372. While "any inference that everyone on the scene of a crime is a party to it must disappear" if the guilty person is singled out, id. at 374 (alterations omitted) (quoting United States v. Di Re, 332 U.S. 581, 592–94 (1948)), without such a singling out, the officer could reasonably infer "that any or all three of the occupants had knowledge of, and exercised dominion and control over, the cocaine." See id. at 372 (emphasis added).

Before we hold officers liable, we must ensure that they were fairly put on notice that their actions were unlawful. The contours of the law must be sufficiently drawn so that a reasonable officer knows when he is acting outside of those lines—the law must be clearly established. That was simply not the case here. Though Ybarra requires particularized probable cause, Pringle raises questions regarding how that requirement is satisfied in multi-suspect situations. The officer in Pringle knew a crime had been committed but could not identify the perpetrator. He was presented with three suspects, none of whom were

- 13 -

independently suspected prior to the stop. Evidence of a "common enterprise" existed, and so the officer could reasonably infer that all present were involved in the crime. In such a scenario, the Supreme Court seemed satisfied that Ybarra's particularized probable cause requirement was met. But see Maclin, supra, at 415 (arguing that Pringle effectively eliminated Ybarra's particularized probable cause requirement).

But what if there were ten passengers, not three? What if the suspects were in a house, not a car? What if they were engaged in theft, not drug dealing? The Court did not establish a clear standard for applying Pringle beyond its specific facts. But neither are the facts of this case so distinct from Pringle that an officer could not reasonably assume it applied. Simply put, Pringle's application to this case is debatable. See 2 LaFave, Search & Seizure, supra, § 3.2(e) (concluding that the Supreme Court side-stepped the question of whether probable cause requires "more probable than not as to a particular member of the group"). We cannot ask officers to make a legal determination—that law professors probably could not agree upon—without any guidance from the courts and then hold them liable for guessing incorrectly. Qualified immunity exists to prevent exactly that. Plaintiffs offer us no other case on point to establish that Defendants violated their clearly established rights by arresting the entire unit.

C.    The Unified Government's Appeal

Of course, an entity defendant is not entitled to qualified immunity and the

denial of summary judgment is not immediately appealable.  <u>Moore v. City of Wynnewood</u>, 57 F.3d 924, 928–29 (10th Cir. 1995).  We refuse to exercise pendent jurisdiction to avoid that result.

REVERSED.  We DISMISS the appeal of the Unified Government.  We GRANT Defendants' motion to file a supplemental appendix.  All other pending motions seeking any other relief are DENIED.