**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DANIELLA SLATER; DAMIEN SLATER,
individually and as successors in
interest, by and through their
Guardian ad Litem Sandra Salazar;
TINA SLATER; DAVID BOUCHARD,
individually,

          *Plaintiffs-Appellants*,

v.

SHANNON DEASEY, Deputy;
previously erroneously named as
Shandon Deasey; PETER GENTRY,
Deputy; GARY BRANDT, Deputy;
MIKE RUDE, Sgt.; COUNTY OF SAN
BERNARDINO; DOES, 1–10, Inclusive,
          *Defendants-Appellees.*

No. 17-56708

D.C. No.
5:16-cv-01103-
JFW-KK

| | |
|---|---|
| DANIELLA SLATER; DAMIEN SLATER, individually and as successors in interest, by and through their Guardian ad Litem Sandra Salazar; TINA SLATER; DAVID BOUCHARD, individually, *Plaintiffs-Appellees*, v. SHANNON DEASEY, Deputy; previously erroneously named as Shandon Deasey; PETER GENTRY, Deputy; GARY BRANDT, Deputy; MIKE RUDE, Sgt.; COUNTY OF SAN BERNARDINO, *Defendants-Appellants.* | No. 17-56751 D.C. No. 5:16-cv-01103-JFW-KK ORDER |

Filed December 3, 2019

Before:  Jacqueline H. Nguyen and John B. Owens, Circuit Judges, and John Antoon II,[*] District Judge.

Order;
Dissent by Judge Collins

---

[*] The Honorable John Antoon II, United States District Judge for the Middle District of Florida, sitting by designation.

# SUMMARY[**]

---

## Civil Rights

The panel denied a petition for panel rehearing and denied a petition for rehearing en banc on behalf of the court, and ordered that no further petitions shall be entertained.

Dissenting from the denial of rehearing en banc, Judge Collins, joined by Judges Bea, Ikuta, and Bress, stated that in holding that the police officers in this case violated clearly established law when they restrained Joseph Slater in the back of a patrol car, allegedly causing his death, the panel continued this court's troubling pattern of ignoring the Supreme Court's controlling precedent concerning qualified immunity in Fourth Amendment cases. Judge Collins stated that Plaintiffs had the burden to find a controlling precedent that squarely governed the specific facts of this case. They failed to carry that burden, and the district court's grant of summary judgment on qualified immunity grounds should have been affirmed.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## **ORDER**

The panel voted to deny Defendants' petition for panel rehearing. Judges Nguyen and Owens voted, and Judge Antoon recommended, to deny Defendants' petition for rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. *See* Fed. R. App. P. 35.

The petition for panel rehearing and the petition for rehearing en banc are denied. No future petitions for rehearing or rehearing en banc will be entertained.

---

COLLINS, Circuit Judge, with whom BEA, IKUTA, and BRESS, Circuit Judges, join, dissenting from the denial of rehearing en banc:

In holding that the police officers in this case violated clearly established law when they restrained Joseph Slater in the back of a patrol car, allegedly causing his death, the panel continues this court's troubling pattern of ignoring the Supreme Court's controlling precedent concerning qualified immunity in Fourth Amendment cases. Indeed, over just the last ten years alone, the Court has reversed our denials of qualified immunity in Fourth Amendment cases at least a half-dozen times, often summarily. By repeating—if not outdoing—the same patent errors that have drawn such repeated rebukes from the high Court, the panel here once again invites summary reversal. I respectfully dissent from our failure to rehear this case en banc.

Two particular features of the panel's decision underscore its neglect of binding Supreme Court authority. First, in addressing whether the relevant law was "clearly established," the panel disregarded the Court's clear instruction that, in Fourth Amendment excessive force cases, "police officers are entitled to qualified immunity unless existing precedent '*squarely governs*' the *specific* facts at issue." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (citation omitted) (emphasis added). There is no such squarely governing precedent here, and the panel did not claim there was. Instead, the panel simply ignored *Kisela* (and all of our other recent reversals in Fourth Amendment qualified immunity cases) and denied qualified immunity based on its identification of a single Ninth Circuit decision—*Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003)—that the panel concluded was "sufficiently analogous" to this case. *See Slater v. Deasey*, Mem. Dispo. at 7 (amending 776 F. App'x 942 (9th Cir. 2019)). In applying this lesser "sufficiently analogous" standard, the panel committed the very same error for which we were summarily reversed in *Kisela*. *See* 138 S. Ct. at 1151 (Ninth Circuit had denied qualified immunity "because of Circuit precedent that the court perceived to be analogous").

Second, the panel violated governing Supreme Court authority when it extracted from *Drummond* a "clearly established" rule that is framed at a much higher level of generality than *Drummond* itself. As the Supreme Court has stated, with evident exasperation, "[w]e have repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality." *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 (2015) (citations and internal quotation marks omitted). Despite professing to "'hear the Supreme Court loud and

clear,'" *Slater*, Mem. Dispo. at 6 (citation omitted), the panel is jurisprudentially a bit deaf, because its decision here significantly raised the level of generality of the rule in *Drummond*, and in doing so, it overlooked critical differences between *Drummond* and this case.

The Plaintiffs' claim in this tragic case is that, by using "hobbles" (a form of restraining belt) to prevent Slater from moving around in the patrol car, and by applying brief incidental pressure to Slater while applying the hobbles, the officers caused him to suffer "positional or restraint asphyxia," resulting in his death. According to the panel, the officers were not entitled to qualified immunity for these actions because "[i]n *Drummond*, we clearly established that 'squeezing the breath from a compliant, prone, and handcuffed individual . . . involves a degree of force that is greater than reasonable.'" *Slater*, Mem. Dispo. at 6 (quoting *Drummond*, 343 F.3d at 1059) (ellipses in original). But this statement literally elides critical differences between this case and *Drummond* by improperly using ellipses to generalize *Drummond*'s much more specific holding that "any reasonable person" should have known that "squeezing the breath from a compliant, prone, and handcuffed individual *despite his pleas for air* involves a degree of force that is greater than reasonable." 343 F.3d at 1059 (emphasis added). That critical feature of *Drummond* is missing here: in this case, once the officers noticed that Slater appeared to be in trouble, they promptly summoned paramedics (who had examined Slater earlier and were still on the scene). Moreover, *Drummond* differs in a second crucial respect, inasmuch as the nature and extent of the force applied by the officers in the two cases are very different. While the two officers in *Drummond* literally "squeez[ed] the breath" from Drummond by "press[ing] their weight against his torso and neck, crushing him against the ground" for a "substantial

period of time," 343 F.3d at 1059–60 & n.7, the specific challenged actions of the officers here did not involve any such direct, sustained compression with the officers' body weight.  Instead, Plaintiffs claim that the manner in which the hobbles were applied put Slater in a *position* such that, coupled with the brief incidental pressure placed on his back during securing of the hobbles, he was at risk of "positional or restraint asphyxia."  Given these significant distinctions, *Drummond* cannot be described as "'squarely govern[ing]' the specific facts at issue."  *Kisela*, 138 S. Ct. at 1153 (citation omitted).

Under the qualified immunity standards that have been clearly established by the Supreme Court, the district court's dismissal of this action should have been affirmed.  I dissent from our failure to rehear this case en banc.

## I

Because Fourth Amendment excessive force claims "depend[] very much on the facts of each case," *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (citation and internal quotation marks omitted), it is important to review in some detail the specific alleged actions of the officers that are challenged in this § 1983 suit.

## A

On April 15, 2015, sometime around 1:00 AM, Deputy Sheriff Shannon Deasey of the County of San Bernardino Sheriff's Department responded to a radio call that a man was pulling out wires from a Valero gas station building in

Highland, California.[1]   After Deasey arrived at the Valero station, he saw a man who fit the radioed description crouched down near the front of the gas station.   Deasey immediately recognized the man as Slater.   Deasey personally knew, from multiple prior encounters, that Slater had a history of mental illness and drug use.

Deasey identified himself to Slater and asked him what he was doing, but Slater would not respond and instead appeared "mesmerized" by a nearby electronic display screen.   Deasey handcuffed Slater without resistance and, after walking Slater over to the police car, Deasey opened the door and asked him to sit down.   Slater sat down sideways, with his feet outside the vehicle, but he resisted placing his feet in the car.   Slater became paranoid, repeatedly denying that Deasey was a cop and saying that he believed Deasey was going to kill him.   When Slater refused Deasey's repeated commands to slide into the car, Deasey threatened to use pepper spray on Slater, and then twice did so.   Ultimately, Deasey could not restrain Slater, and he pulled him out of the car.   Deasey instead attempted to restrain Slater on the ground, and he again used his pepper spray.   Deasey then used a "knee strike" to get Slater to stop resisting; the parties dispute whether the knee strike was on Slater's lower back or his buttocks/thigh area.   Deasey radioed for backup, and he also asked for a medical unit.

Deputy Pete Gentry arrived next on the scene, and he saw Slater on the ground moving his feet back and forth

---

[1] Because much of the incident was captured on the Valero station's cameras, and parts were also audio recorded on Deasey's belt recorder, many of the core facts of the incident are undisputed.  Where the parties' inferences from the video and audio evidence or deposition testimony differ, I have relied on Plaintiffs' version. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

while Deasey attempted to restrain him. Gentry suggested that Deasey get a "hobble," a form of belt used in restraining detainees, and Gentry grabbed hold of Slater while Deasey went to retrieve a hobble from his vehicle. When Deasey returned, Gentry ultimately shifted positions and ended up with his knee across Slater's shoulderblades for about 40 seconds, while Slater was on his stomach on the ground. After Gentry removed his knee from Slater's back, Slater lay on the ground on his right side.

Sergeant Mike Rude arrived next, and he assisted Deasey in placing the hobble on Slater's legs. Once the hobble was applied, the three officers stepped back, and Slater was able to sit upright on the ground. Slater continued in that position until paramedics arrived from the California Fire Department ("Cal Fire"). Throughout this time, Slater continued to talk irrationally, saying names or numbers seemingly at random. Deputy Gary Brandt then arrived, and he waited with the other officers and Slater.

The Cal Fire paramedics examined Slater and concluded that there was no medical emergency. Gentry and Rude then carried Slater over to the gas station's air and water area, with Brandt following along, and they attempted to wash the pepper spray off Slater. After attempting to wash Slater, Brandt and Gentry carried Slater back to Deasey's vehicle, whose driver side rear door was still open. They then attempted to place Slater headfirst and chest down into the vehicle, and as they did so, Slater was flailing about. Meanwhile, Rude went around to the other side of the vehicle, opened the rear passenger door, and attempted to pull Slater by his shirt while Brandt and Gentry pushed him in from the driver side. Slater lay on his stomach for a few seconds and then moved himself into an upright seated position, where he continued moving about and speaking

irrationally. During this time, an ambulance had also arrived, but after the ambulance personnel briefly communicated with the Cal Fire paramedics, the Cal Fire personnel told them that they could leave.

Gentry and Brandt attempted to put the vehicle's seat belt on Slater, with Gentry leaning in through the rear passenger door, and Brandt leaning in through the opposite door and handing Gentry the seat belt. Slater leaned away from Gentry, but Gentry pulled him back up, and Brandt closed the rear driver side door. Slater, who was still not seatbelted, slid halfway out of the open passenger side door, so that his body from the waist up was outside the passenger side and his head was almost touching the ground. Gentry and Brandt then placed Slater back into the car, face down, with his head now pointing towards the driver side. Slater continued moving in the back of the car, although the parties dispute how much he was moving about.

Gentry suggested applying another hobble, and Brandt retrieved one and gave it to Gentry. Gentry opened the driver side rear door, put his left foot on the rear floor of the car, leaned over Slater (who was chest down with his head toward the driver side), and then applied the hobble to Slater's ankles. Gentry then passed part of the second hobble through the cage area that separated the back seat from the front seat, and Deasey, who was leaning through the now open driver side front door, took hold of it. Gentry then stepped out of the vehicle. During the time that Gentry applied this second hobble, his right knee applied pressure to Slater's left rib area for up to 45 seconds. After grabbing the second hobble in the front driver area, Deasey realized that it was too short to attach to the front driver seat hook. So Deasey attached a third hobble to the second one and looped the third hobble to the back of the car and through the

open driver side rear door, which he then shut closed on the hobble. During most of the time that Gentry and Deasey were securing the second and third hobbles, Brandt, who was standing outside near the open driver side rear door, had his right foot against Slater's left shoulder. Brandt claimed that he did this in order to prevent Slater from sliding himself out of the patrol car. Brandt's right foot was against Slater's left shoulder for about 70 seconds. The entire process for securing the second and third hobbles took about 86 seconds.

After the second and third hobbles were secured, Slater lay mostly on his stomach on the backseat of the patrol car, with his legs drawn up behind him towards his buttocks. Slater had little, if any, ability to move his legs.

Brandt heard Slater make a spitting noise just before the driver side rear door was closed. After about 40 seconds, the officers noticed that Slater was no longer moving, had stopped speaking, and might have stopped breathing. The officers also noticed that Slater had vomited a small amount. Gentry opened the driver side rear door and unsuccessfully attempted to get Slater to respond. Slater was removed from the car, and the Cal Fire paramedics attempted to resuscitate him. Slater was transported to the hospital where he was pronounced dead.

The pathologist who performed the autopsy of Slater concluded that he had died of "acute methamphetamine intoxication."

**B**

Plaintiffs, who are Slater's surviving relatives, brought this suit against Defendants Deasey, Gentry, Brandt, and Rude ("Defendants"), asserting a variety of claims under

42 U.S.C. § 1983 and under state law.[2]  After discovery was completed, Defendants moved for summary judgment.  With respect to Plaintiffs' § 1983 claim of excessive force, Defendants argued that (1) each application of force against Slater was reasonable; (2) alternatively, Defendants were entitled to qualified immunity as to any force that may have been excessive; and (3) there was insufficient admissible evidence to establish that Defendants' application of force caused Slater's death.  In connection with the latter argument, Defendants submitted the report and deposition testimony of the pathologist who performed the autopsy of Slater, and they also filed a *Daubert* motion to exclude the testimony of Plaintiffs' causation expert.

Plaintiffs opposed both the summary judgment motion and the *Daubert* motion.  On the causation issue, Plaintiffs contended that there was sufficient evidence to permit a reasonable jury to conclude that "positional or restraint asphyxia" was the cause of Slater's death.  In support of this contention, Plaintiffs supplied the declaration of their causation expert, who explained his opinion as to the cause of death as follows:

> In Mr. Slater's case, respiratory compromise, vomiting with aspiration of vomit into Mr. Slater's airway, and loss of consciousness happened within seconds of the final hobbles being attached and pulled tight. *The prone and hobbled position Mr. Slater was in compromised his ability to breathe, compressed his abdomen and chest, and led to his vomiting and aspirating the*

---

[2] The County was named as an additional defendant only in the state law claims.

> *vomit into his lungs. This prevented sufficient breathing, leading to loss of consciousness and resulting in death.*
>
> . . .
>
> It is well accepted that inhibition of respiration and/or inhibition of blood flow caused by too much weight on the back for too long can cause asphyxia. The probable trigger for Mr. Slater's vomiting and ultimately for his asphyxial death was likely the effects of the way he was restrained prone, hogtied, and compressed even more by the pressure on his back by two deputies. Even more pressure was applied to Slater's abdomen and chest by his legs being drawn upward and back towards his buttocks with the addition of more hobbles and the improvised technique used to increase the tension on the 2nd and 3rd hobbles. This transferred more of the weight of his legs to his abdomen and chest, the fulcrum for his body weight in his prone position in the car.

Plaintiffs' expert also explained why he ruled out methamphetamine overdose as the cause of death.

After a hearing on the motions and supplemental briefing, the district court granted summary judgment to Defendants. The court first held that, viewing the evidence in the light most favorable to the Plaintiffs, "Deasey's use of pepper spray, Deasey's knee strike to Slater, and the application of the first hobble (including any force that may have been used by the deputies in applying that hobble) were

reasonable and did not violate Slater's Fourth Amendment rights." As to the second and third hobbles, the court held that a reasonable jury could find that the force used was excessive. The court nonetheless granted summary judgment based on qualified immunity, holding that "Plaintiffs have failed to carry their burden of demonstrating that the constitutional right at issue was clearly established such that a reasonable law enforcement officer would have known that his challenged conduct was unlawful." The court dismissed the pendent state law claims without prejudice, and it denied as moot the *Daubert* motion concerning Plaintiffs' causation expert.

## C

A panel of this court affirmed in part and reversed in part. The panel affirmed the district court's conclusion that, as a matter of law, the application of the first hobble did not constitute excessive force. *Slater*, Mem. Dispo. at 3. As to the second and third hobbles, the panel agreed that a reasonable jury could find the force to be excessive, but the panel reversed the grant of summary judgment based on qualified immunity. *Id*. at 4–7. According to the panel, this court's decision in *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), was "sufficiently analogous" to put Defendants "on notice that their use of force violated the Fourth Amendment." *Slater*, Mem. Dispo. at 7. In light of this ruling, the panel vacated the dismissal of the state law claims and one additional claim, *id*. at 7 & n.4, and remanded the case "for trial," *id*. at 2.

## II

By failing to apply—and in some respects even to mention—the controlling standards that govern the qualified immunity inquiry under the Supreme Court's and this court's

recent precedent, the panel's decision warrants en banc review. *See* Fed. R. App. P. 35(b)(1)(A) (en banc review is warranted when "the panel decision conflicts with a decision of the United States Supreme Court or of th[is] court"). Had those standards been applied, the panel would have had no choice but to affirm the district court's holding that the officers were entitled to qualified immunity.

## A

Although the Supreme Court has issued numerous opinions over the last ten years that have refined and limited what it means to say that a right was "clearly established" for qualified immunity purposes, the panel largely ignored that case law. Instead, quoting from a 2003 decision of this court, the panel relied primarily on a more general proposition that qualified immunity turns on:

> "whether the right was clearly established in light of the specific context of the case" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."

*Slater*, Mem. Dispo. at 5 (quoting *Drummond*, 343 F.3d at 1056 (further citation and internal quotation marks omitted)). Applying that more general standard, the panel held that qualified immunity was inapplicable because "the circumstances here are sufficiently analogous to *Drummond* such that Defendants were on notice that their use of force violated the Fourth Amendment." *Slater*, Mem. Dispo. at 7. The panel's analysis disregards the relevant qualified immunity standards as more specifically articulated in the Supreme Court's recent case law.

Since our 2003 opinion in *Drummond*, the Supreme Court has issued no less than eight opinions reversing this court's denial of qualified immunity in Fourth Amendment cases—four of which were summary reversals. *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019) (summarily reversing); *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (summarily reversing); *City & Cty. of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015); *Stanton v. Sims*, 571 U.S. 3 (2013) (summarily reversing); *Messerschmidt v. Millender*, 565 U.S. 535 (2012); *Ashcroft v. al-Kidd*, 563 U.S. 731 (2011); *Safford Unified School Dist. No. 1 v. Redding*, 557 U.S. 364 (2009); *Brosseau v. Haugen*, 543 U.S. 194 (2004) (summarily reversing). During that same time period, the Court has issued six more opinions reversing the other circuit courts' denial of qualified immunity in Fourth Amendment cases, and three of those were summary reversals. *District of Columbia v. Wesby*, 138 S. Ct. 577 (2018); *White v. Pauly*, 137 S. Ct. 548 (2017) (summarily reversing); *Mullenix v. Luna*, 136 S. Ct. 305 (2015) (summarily reversing); *Carroll v. Carman*, 574 U.S. 13 (2014) (summarily reversing); *Plumhoff v. Rickard*, 572 U.S. 765 (2014); *Pearson v. Callahan*, 555 U.S. 223 (2009). Given that the Supreme Court has thus issued a total of 14 opinions since 2003 reversing the circuit courts' denials of qualified immunity in Fourth Amendment cases, including seven summary reversals, the panel clearly erred when it disregarded much of what the Court said in those cases. This recent Supreme Court precedent has reiterated two important and closely related rules, and the panel violated both of them in its decision.

The first of these rules is the more general principle—applicable to all qualified immunity cases—"that clearly established law should not be defined at a high level of generality." *White*, 137 S. Ct. at 552 (citation and internal

quotation marks omitted). Because an officer is entitled to qualified immunity unless then-existing precedent "clearly prohibit[s] the officer's conduct in the *particular circumstances* before him," *Wesby*, 138 S. Ct. at 590 (emphasis added), "general proposition[s]" are "of little help in determining whether the violative nature of particular conduct is clearly established," *al-Kidd*, 563 U.S. at 742; *see also Plumhoff*, 572 U.S. at 779 (more generally phrased propositions do not defeat qualified immunity because they "avoid[] the crucial question whether the official acted reasonably in the particular circumstances that he or she faced"). If it were permissible to generalize beyond the specific points established in the existing precedent, "'[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *White*, 137 S. Ct. at 552 (citation omitted). This court has nonetheless routinely strayed from this rule, prompting the Supreme Court to admonish that it has "'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *Sheehan*, 135 S. Ct. at 1775–76 (citation omitted). In its amended memorandum disposition, the panel now at least pays lip service to this rule by quoting *White*'s recitation of it, *see Slater*, Mem. Dispo. at 6, but the panel then still proceeds to flout that rule by relying on higher-level generalizations when defining the relevant clearly established law. *See infra* at 19–25.

The second rule that emerges from the Supreme Court's recent case law is a close corollary of the first, and it underscores the especially heightened need for specificity in the context of a Fourth Amendment excessive force case. *Mullenix*, 136 S. Ct. at 308. Because "[u]se of excessive force is an area of the law 'in which the result depends very

much on the facts of each case,' . . . police officers are entitled to qualified immunity unless existing precedent '*squarely governs*' the *specific* facts at issue." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 136 S. Ct. at 309) (emphasis added). As this court recently emphasized in a published decision concerning qualified immunity in the Fourth Amendment context, "we must locate a controlling case that 'squarely governs the specific facts at issue,' except in the 'rare obvious case' in which a general legal principle makes the unlawfulness of the officer's conduct clear despite a lack of precedent addressing similar circumstances." *West v. City of Caldwell*, 931 F.3d 978, 983 (9th Cir. 2019) (citation omitted).

The panel does not contend (and, as the discussion below makes clear, could not contend) that this is the "rare obvious case" in which the general legal principles governing excessive force would have been sufficient to alert "every reasonable officer" that applying a further hobble to Slater would violate the Constitution. *Wesby*, 138 S. Ct. at 590–92. Accordingly, the panel was required to identify "existing precedent" that "'squarely governs' the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (quoting *Mullenix*, 136 S. Ct. at 309); *see also West*, 931 F.3d at 983. The panel, however, did not even recite that demanding standard, much less apply it. Instead, the panel held that the officers here were not entitled to qualified immunity because (in the panel's view) this court's decision in *Drummond* was "sufficiently analogous" to this case to put Defendants "on notice that their use of force violated the Fourth Amendment." *Slater*, Mem. Dispo. at 7. This watered-down "sufficiently analogous" test more closely resembles the standard that we applied in *Kisela* and that earned us a summary reversal by the Supreme Court. *See* 138 S. Ct. at 1151. Moreover, as set forth below, the panel's effort to

stretch *Drummond* to cover the facts of this case violates both the Court's repeated admonition not to resort to higher levels of generality and the Court's insistence on identifying a controlling precedent that squarely governs the specific facts at issue.

## B

In contending that *Drummond* was alone sufficient to defeat qualified immunity, the panel ignored two significant differences between *Drummond* and this case.

## 1

First, the panel misstated the specific holding of *Drummond* and, in doing so, it improperly raised the level of generality of the rule established in that case. According to the panel, *Drummond* "clearly established that 'squeezing the breath from a compliant, prone, and handcuffed individual . . . involves a degree of force that is greater than reasonable.'" *Slater*, Mem. Dispo. at 6 (quoting *Drummond*, 343 F.3d at 1059) (ellipses added by panel). The problem with this contention is that the panel's quotation improperly used ellipses to edit out a crucial fact that makes clear that *Drummond* is *not* analogous to this case. The actual quoted language from Drummond is as follows, and it includes the additional italicized phrase:

> The officers—indeed, any reasonable person—should have known that squeezing the breath from a compliant, prone, and handcuffed individual *despite his pleas for air* involves a degree of force that is greater than reasonable.

343 F.3d at 1059 (emphasis added). The language omitted by the panel was not an irrelevant or insignificant detail; on the contrary, the *Drummond* court repeatedly emphasized this important factor in finding that the officers in that case were not entitled to qualified immunity. *See id.* at 1061 ("The officers allegedly crushed Drummond against the ground by pressing their weight on his neck and torso, and continuing to do so *despite his repeated cries for air*, and despite the fact that his hands were cuffed behind his back and he was offering no resistance. *Any* reasonable officer should have known that such conduct constituted the use of excessive force") (emphasis added); *id.* at 1062 ("We need no federal case directly on point to establish that kneeling on the back and neck of a compliant detainee, and pressing the weight of two officers' bodies on him *even after he complained that he was choking and in need of air* violates clearly established law, and that reasonable officers would have been aware that such was the case.") (emphasis added). On top of this express language from *Drummond* itself, common sense confirms that there is an obvious difference between continuing to apply substantial force *while disregarding* explicit cries for air and applying force to a detainee *without* any such protest (and therefore without any such equivalent disregard of actual "notice of the detainee's respiratory distress"). *Id.* at 1060 n.7.

In view of this critical factor, *Drummond* cannot be characterized as a "controlling case that squarely governs the specific facts at issue." *West*, 931 F.3d at 983 (citations and internal quotation marks omitted); *see also Kisela*, 138 S. Ct. at 1153. Here, the first indications that Slater might be struggling to breathe were his spitting noises and vomiting, *see Slater*, Mem. Dispo. at 7, but these acts were first observed *after* Slater was restrained, and the officers did not ignore them. The spitting noise occurred just before the

driver side rear door was closed after the application of the third hobble—meaning that it occurred after the officers had completed their actions in applying force to Slater. Likewise, the vomiting was noticed through the window after the rear door had been closed and before the officers promptly reopened it to check on Slater. When the officers confirmed that he was in distress, Slater was immediately attended to by the Cal Fire paramedics who were still on the scene. By promptly responding to the first indication that Slater was in distress, and calling over medical assistance, the officers here did the opposite of the officers in *Drummond*, who instead ignored the detainee's pleas for air and continued pressing on his body with the full weight of two officers. 343 F.3d at 1059, 1061–62.

This crucial difference—that, unlike in this case, the officers in *Drummond* continued to apply force despite the detainee's pleas for air—"'leap[s] from the page.'" *Kisela*, 138 S. Ct. at 1154 (quoting *Sheehan*, 135 S. Ct. at 1776). Or, to be more precise, it would have leapt from the page had the panel not effaced the text. Moreover, by excising a factor that was crucial to *Drummond*'s holding, the panel here necessarily raised the level of generality of the rule established in *Drummond*, thereby contravening the Supreme Court's repeated admonition "not to define clearly established law at a high level of generality." *Emmons*, 139 S. Ct. at 503.[3]

---

[3] The panel points to three out-of-circuit decisions to justify its disregard of *Drummond*'s emphasis on the officers' awareness of the detainee's respiratory distress. To the extent that these decisions assertedly found a violation of clearly established law despite the lack of any apparent respiratory distress, *but see*, *e.g.*, *McCue v. City of Bangor*, 838 F.3d 55, 59 (1st Cir. 2016) (noting that the defendant officer continued to press his knee on McCue's neck "even after McCue twice

**2**

Beyond that, there is a second respect in which *Drummond* differs critically from this case. As *Drummond* itself emphasized, the force applied there involved "two officers leaning their weight on Drummond's neck and torso for a substantial period of time," creating an obvious risk of "compression asphyxia." 343 F.3d at 1059–60 & n.7. Indeed, in holding that the officers should have been aware of the risks of placing their full body weight on a detainee, the *Drummond* court emphasized the well-known and well-publicized risks of "compression asphyxia" no less than four times in its opinion. *Id*. at 1056, 1059, 1061, 1062. By contrast, in this case, there is no evidence that the officers ever put their full body weight on Slater during application of the second and third hobbles, much less that they did so for a substantial period of time. As noted earlier, at most, Gentry's right knee applied pressure to Slater's left rib area

_____

shout[ed] in distress that the officers are hurting his neck"), they did so only in the context of condemning an officer's direct application of "*significant, continued force on a person's back* 'while that [person] is in a face-down prone position after being subdued and/or incapacitated,'" *id*. at 64 (quoting *Weigel v. Broad*, 544 F.3d 1143, 1155 (10th Cir. 2008) (in turn quoting *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 903 (6th Cir. 2004) (emphasis added) (further quotation marks omitted))). Thus, to the extent that these other circuits might be said to have thereby extended and generalized *Drummond*'s holding, they have done so in a way that does *not* cover this case. *See*, *e.g.*, *Champion*, 380 F.3d at 903 ("This is neither a 'positional asphyxia' case nor a case in which the officers lightly touched or placed incidental pressure on Champion's back while he was face down"); *see generally infra* at 19–25. Where, as here, the officers' actions do not involve that sort of obviously dangerous direct application of full body weight to compress the detainee's back or neck for a sustained period of time, *Drummond* confirms the continued importance of whether "the police were actually put on notice of the detainee's respiratory distress." 343 F.3d at 1060 n.7. The officers here did not ignore any such notice.

for up to 45 seconds while Gentry applied the second hobble, and given that Gentry had his left leg on the car floor during that whole time, this incidental pressure would not have applied Gentry's full body weight to Slater. Likewise, Brandt did not place his full body weight on Slater, because Brandt was standing *outside* the car and extended his right foot into the car and against Slater's left shoulder. And Brandt's right foot was thus positioned against Slater's left shoulder for only about 70 seconds. As the panel itself elsewhere concedes, the evidence at most shows that the two officers applied "some pressure" to Slater. *Slater*, Mem. Dispo. at 4. The pressure applied by the two officers with their bodies here was materially different, both in nature and in duration, from that applied in *Drummond*. This point is underscored by *Drummond* itself, which in a footnote distinguished two cases in which incidental or light pressure was applied to a struggling detainee for less than one minute. *See* 343 F.3d at 1060 n.7.

To be sure, this case involves not just the alleged compression from the officer's knee and foot, but also the alleged breathing difficulty created by the *position* in which the hobbles ultimately put Slater. But this factor only further underscores how very different this case is from *Drummond* and how that decision cannot reasonably be said to "'squarely govern[]' the specific facts at issue" here. *Kisela*, 138 S. Ct. at 1153 (citation omitted). Indeed, in opposing summary judgment below, Plaintiffs' theory was not, as in *Drummond*, a straightforward case of compression asphyxia; rather, Plaintiffs contended that the evidence would permit a reasonable jury to conclude that "*positional or restraint* asphyxia" was the cause of Slater's death. As Plaintiffs' causation expert explained, "[t]he *prone and hobbled position* Mr. Slater was in compromised his ability to breathe, compressed his abdomen and chest, and led to his

vomiting and aspirating the vomit into his lungs. This prevented sufficient breathing, leading to loss of consciousness and resulting in death." Plaintiffs' expert also identified the officers' pressure on Slater during the application of the second and third hobbles as an additional factor in Slater's alleged asphyxia, but only *in combination* with the asserted breathing difficulties created by his prone and hobbled position. *Drummond*, however, does not address such a hybrid positional asphyxia theory, and it does not provide a basis for concluding that any reasonable officer would have recognized that Slater's hobbled position might cause him to asphyxiate.

The panel's broadening of *Drummond* confirms just how far the panel has departed from the controlling qualified immunity standards. The focus of the qualified immunity inquiry has to be on the specific *actions* of the officers, and whether the law clearly established that "the Fourth Amendment prohibited the officer[s'] conduct in the situation [they] confronted." *Mullenix*, 136 S. Ct. at 309 (citation and internal quotation marks omitted). But the panel's broadening of *Drummond* converts it into a rule about *outcomes*: if "asphyxia" results, it does not matter whether it was caused by the officers' use of direct "compression" (as in *Drummond*) or was caused by a collection of restraints, together with brief incidental compression (as in this case). However, the relevant question for qualified immunity is not what outcome occurred as a result of the officers' actions; the relevant question is *what specific actions did the officers take*.

By ignoring all of these obvious differences between *Drummond* and this case, the panel has effectively applied an unstated but much broader rule that condemns a set of police restraints that are not covered by the requisite

controlling precedent that "squarely governs the specific facts at issue." *Kisela*, 138 S. Ct. at 1153 (citation and internal quotation marks omitted). The panel's reasoning and result cannot be squared with the Supreme Court's demanding standards for defeating qualified immunity.

## III

The panel committed a further, related error in suggesting that *Defendants* bear the burden of proof on the disputed qualified-immunity issues presented in this appeal.

In reciting the general standards governing qualified immunity, the panel stated that "Defendants bear the burden of proving they are entitled to qualified immunity. *See Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005)." *Slater*, Mem. Dispo. at 5. But on the cited page, *Moreno* merely recites the boilerplate summary judgment point that, "[b]ecause the moving defendant bears the burden of proof on the issue of qualified immunity, he or she must *produce sufficient evidence to require the plaintiff to go beyond his or her pleadings*." 431 F.3d at 638 (emphasis added). That, of course, is not the relevant burden of proof on the qualified-immunity issues presented in this appeal. Rather, the applicable—and well-settled—rule is that "[t]he *plaintiff* bears the burden of proof that the right allegedly violated was *clearly established* at the time of the alleged misconduct." *Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) (emphasis added); *see also Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017). Other circuits follow the same rule. *See*, *e.g.*, *Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1027 (10th Cir. 2015) ("When a defendant raises the defense of qualified immunity, the plaintiff bears the burden to demonstrate that the defendant violated his constitutional rights and that the right was clearly established."); *Findlay v. Lendermon*,

722 F.3d 895, 900 (7th Cir. 2013) (plaintiff failed to "carry his burden of showing a clearly established right" when he failed to identify precedent showing that "any reasonable officer would know [the conduct at issue] violated the constitution").

The panel's error on this point is significant, because it underscores that Plaintiffs had the burden to find a controlling precedent that squarely governs the specific facts of this case. They failed to carry that burden, and the district court's grant of summary judgment on qualified immunity grounds should have been affirmed.

I respectfully dissent from the denial of rehearing en banc.